UNITED STATES of America,
Appellant,

v.

Alberto ORLANDEZ–GAMBOA, aka
"Caracol," aka "Chiriqui,"
Defendant–Appellee.

Docket No. 02–1674.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 27, 2003.
Decided: Feb. 20, 2003.

Roberto Finzi, Assistant United States Attorney, for James B. Comey, United States Attorney for the Southern District of New York, (Mark F. Mendelsohn, Andrew Ceresney, Assistant United States Attorneys, of counsel) New York, New York, for Appellant.

Pery D. Krinsky, Paul R. Warburgh, James M. LaRossa, Michael S. Ross, New York, New York, for Defendant–Appellee.

Before: OAKES, CALABRESI, and SACK, Circuit Judges.

CALABRESI, Circuit Judge.

This is an interlocutory appeal from an order of the federal district court for the Southern District of New York (Griesa, *J.*) declaring inadmissible statements made by Defendant–Appellee Alberto Orlandez–Gamboa to Colombian prosecutors.[1] The signed statements at issue were made by Gamboa in the course of the Colombian equivalent of plea negotiations with respect to Gamboa's alleged drug trafficking. We are asked whether admission of this evidence is barred by Federal Rule of Evidence 410(4), as the district court held, or, in the alternative by the Fifth Amendment. We answer both questions in the negative.

*Facts*

Colombia issued a warrant for Gamboa's arrest in 1997 on charges of kidnaping and murder and arrested him in June 1998. A year later, in an interview with Colombian authorities attended by his attorney, Gamboa claimed he was a legitimate businessman who had been wrongly accused. About the same time, the United States indicted Gamboa on charges that, at least from 1996 to 1999, Gamboa was the leader of a Colombian drug cartel that shipped large quantities of cocaine to locations which included the United States. Several months later, the United States sought Gamboa's extradition.

After the U.S. indictment and a month before the extradition request was made, Gamboa held the first of a series of meetings with Colombian prosecutors. These meetings were held pursuant to Article 37

of Colombia's Criminal Code, referred to in the proceedings below as Colombia's "anticipated sentencing process." Article 37 provides criminal defendants with an opportunity for reduced sentences in exchange for acceptance of charges. As a result of these meetings, Gamboa signed eight statements that "include detailed descriptions of Gamboa's drug trafficking activities."

At the conclusion of this series of meetings, Colombia amended its charges against Gamboa to include only drug activities that had occurred before 1996, that is, prior to the period covered by the U.S. indictment. Significantly, Colombian law permits extradition of a Colombian citizen unless the foreign government's allegations form the basis of charges already pending in Colombia. Thus, after the change in the Colombian charges against him, Gamboa would have remained eligible for extradition whether he accepted those charges or not. He refused to do so and was extradited to the United States to stand trial.

In the district court, Gamboa moved to suppress the statements he had made to Colombian prosecutors, arguing that they were part of Colombia's anticipated sentencing process and had been issued in an attempt to reduce his sentence and to resolve Colombia's charges against him. Because they were made in the course of negotiations concerning sentence, Gamboa contended, the statements were inadmissible under Rule 410(4).

The district court held an evidentiary hearing on the matter, receiving testimony as to whether the Colombian procedure is akin to plea bargaining and whether statements made in the course of that proce-

1. Our jurisdiction to hear this appeal derives from 18 U.S.C. § 3731, which grants to the United States the right to an immediate appeal from pretrial suppression orders "if the

United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding."

dure are later admissible in Colombian courts. While the evidence was not entirely conclusive, the district court did find that the anticipated sentencing process was a form of plea bargaining, that Gamboa's statements were "made in contemplation of a possible plea of guilty," and that there was not "the slightest indication that the defendant was making these statements for any other reason whatever than to obtain" a reduced sentence and resolution of the charges. Rejecting the government's contention that Rule 410 has no extraterritorial effect, the court concluded that because the statements were made in the course of and for the purpose of negotiating a plea, they were not admissible under Rule 410(4).

On appeal, the government does not dispute the district court's determination that the statements were made as part of what would qualify as a "plea negotiation" under Rule 410. Rather, the government asserts that the text of Rule 410, its historical development, and its purpose make clear that the rule does not apply to statements made to prosecuting authorities of foreign jurisdictions. Gamboa, obviously, disagrees, but also asserts that his Fifth Amendment right against self-incrimination and principles of fundamental fairness bar admission of the statements. In reply, the government contends that the rule excluding statements made during plea negotiations is not a constitutional rule of evidence, that there is no evidence that Gamboa was subject to coercion in making the statements, and that the government's use of the evidence does not shock the conscience.

## Discussion

### Rule 410

Our conclusion that Gamboa's statements are admissible under Federal Rule of Evidence 410 is dictated by an analysis of the rule's text, context, and purpose. We begin our *de novo* review by looking at the language of the rule. *See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 163, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *United States v. Figueroa,* 165 F.3d 111, 114 (2d Cir.1998) (citation omitted). That language, in relevant part, reads:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (1) a plea of guilty which was later withdrawn;
>
> (2) a plea of nolo contendere;
>
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
>
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Evid. 410 (2003). Gamboa argues that his statements to Colombian prosecutors in the course of plea negotiations are inadmissible under Rule 410(4). Conceding on appeal that the statements were made in the course of plea discussions, the government maintains that Colombian prosecutors are not meant to be covered by the phrase "attorney for the prosecuting authority."

As the government acknowledges, "attorney for the prosecuting authority" is not a phrase that is helpful to its position. Read in isolation, as "text" standing alone, it does not exclude foreign prosecutors, though it does not expressly mention them either. In plain words, it is inconclusive. As a result, if we are honestly to deter-

mine its meaning, we must, as is often the case, analyze the context in which the phrase is used. We must first examine its statutory setting, and, if that leaves any doubt, look to the history and primary purpose of the rule. *See Connecticut ex rel. Blumenthal v. United States Dep't of the Interior,* 228 F.3d 82, 89 (2d Cir.2000); *see also Benjamin v. Jacobson,* 172 F.3d 144, 191 (2d Cir.1999) *(en banc)* (Calabresi, J., concurring) (noting the traditional practice of English courts, even when barred from citing parliamentary materials, to focus on "the mischief" a statute sought to cure in cases where the text of a statute left the courts uncertain as to its meaning). In all that, we must take care to choose an interpretation of the rule that "does not lead to anomalous or unreasonable results." *Connecticut ex rel. Blumenthal v. United States Dep't of the Interior,* 228 F.3d at 89.

The text of the preceding rule, Rule 410(3), is much clearer and is plainly addressed only to plea allocutions made in *federal* proceedings under Rule 11 or made in *state* proceedings under a "comparable state procedure." That portion of the rule cannot comfortably be read to exclude from evidence in domestic trials statements made during an allocution taking place in a foreign court according to that land's criminal procedures. It makes little sense, however, to interpret the other provisions of Rule 410 to have greater scope than Rule 410(3). To conclude that an *allocution* in a foreign court may be admitted as evidence in a domestic trial but that statements *made in the course of negotiating a plea* may not is to interpret Rule 410

to make a distinction unrelated to any discernible purpose of the rule.

■ There is, in fact, nothing in Rule 410 that evinces an intent to make such a distinction. In a domestic context, which is the context that was plainly of principal concern to Congress when the rule was adopted and amended, allocutions and plea negotiations are expressly treated alike. And there is no reason, adduced or apparent, to suggest that Congress would have wanted to make such a distinction solely as to foreign countries. For, the distinction between foreign and domestic jurisdictions has no obvious bearing on the distinction between allocutions and plea negotiations. *See Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.").

If, moreover, we turn to the aims of Rule 410, we find nothing that undermines the conclusion we have drawn from the rule's language read contextually. In proposing the rule's adoption, the Advisory Committee[2] stated that the "[e]xclusion of offers to plead guilty or *nolo* has as its purpose the promotion of disposition of criminal cases by compromise." Fed. R.Evid. 410, 1972 Advisory Committee note. The Committee noted that plea bargaining, in many localities, was essential to the administration of criminal laws. And, protection of the defendant from the prejudice that would result from the admission of plea negotiations is mentioned by the Advisory Committee not as an end in itself but as a safeguard necessary for the pro-

---

**2.** The Advisory Committee on the Federal Rules of Evidence is a standing committee, the members of which are appointed under the authority of the Judicial Conference. *See* 28 U.S.C. § 2073(b). The committee is charged with proposing rules and providing explanatory notes to the rules. 28 U.S.C. § 2073(d). Federal courts "rel[y] on th[e] well-considered Notes [of the Advisory Committee] as a useful guide in ascertaining the meaning of the Rules." *Tome v. United States,* 513 U.S. 150, 160, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).

motion of frank discussion, without which plea bargaining cannot be successful. "[F]ree communication is needed, and security against having an offer of compromise or related statement admitted in evidence effectively encourages it." *Id.*

While it is plausible to suggest that encouraging similar plea bargaining in foreign jurisdictions would make sound foreign policy, it is also plausible to suggest the opposite. The district court rightly pointed out that the United States has an interest in seeing drug dealers punished, and that this interest is furthered when Colombia effectively enforces its own laws. But it is also the case that the United States may wish to discourage plea bargaining with foreign governments, thereby enhancing the likelihood of extradition of such targets (the only individuals whose willingness to plead could possibly be affected by the scope of Rule 410). It is not, of course, our role to comment on the wisdom of either approach. It is enough to say that what is clearly a function of Rule 410, domestically, does not necessarily apply extraterritorially.[3]

Because of the incongruous result that would obtain were we to interpret the scope of Rule 410(4) to differ from that which is plainly applicable to Rule 410(3), and because the application of Rule 410(4) to plea negotiations conducted by foreign prosecutors is not compelled by the purpose of that rule, we conclude that Rule 410 does not bar the admission into evidence of the statements made by Gamboa to Colombian prosecutors.

*Fifth Amendment*

Gamboa argues that, irrespective of the scope of Rule 410, the admission of statements he made to Colombian authorities would violate his due process rights and his privilege against self-incrimination. Neither claim has merit.

A confession is admissible under the Constitution only if it is made voluntarily. Although this principle and its elaboration have been deemed to be due variously to the Due Process clause and the Fifth Amendment right against self-incrimination, *compare Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), *with Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), the modern test for voluntariness is well established and multi-faceted. *See Dickerson v. United States,* 530 U.S. 428, 433–34, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Arizona v. Fulminante,* 499 U.S. 279, 285–86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997). " 'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.' " *Nelson,* 121 F.3d at 833 (quoting *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.1988), and listing factors to be considered). Notably, none of the factors mentioned in *Nelson* and in *Green* favors the exclusion of Gamboa's statements.

**3.** That is not to say that our interpretation of Rule 410 will not have an effect on foreign defendants. It likely will chill some plea discussions between foreign governments and defendants who are likely extradition targets of the United States. Even in the absence of any act or policy of the United States to encourage such discussions, however, a foreign government wishing to encourage pleas with this kind of defendant can readily protect itself. It can, for instance, agree with the defendant that it will not share the defendant's statements with the United States (or other foreign governments) in the event that the defendant is extradited. Similarly, the defendant can ask for such protection before starting negotiations.

■ The sole form of coercion that Gamboa claims he was subjected to was the inducement to plead created by the prospect of a reduced sentence in exchange for disclosure of his criminal activities. But that fact, alone, will not do. "[T]he presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." *Green*, 850 F.2d at 901.

The case relied on by Gamboa, *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1887), does not alter that conclusion. *Bram* involved a suspect in custody, alone and unrepresented by counsel, as both we and the Supreme Court have emphasized. *See Brady v. United States*, 397 U.S. 742, 754, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Green*, 850 F.2d at 901. In those quite special circumstances, a promise of leniency "was deemed sufficient to overcome his will." *Green*, 850 F.2d at 901. Significantly, the Supreme Court has stated flatly that "it is clear" that the language in *Bram*, relied on here by Gamboa, "that a confession cannot be obtained by 'any direct or implied promises, however slight, nor by the exertion of any improper influence' ... does not state the standard for determining the voluntariness of a confession." *Fulminante*, 499 U.S. at 285, 111 S.Ct. 1246.

We have, of course, held that the prosecution bears the burden of proving that a confession to police was made voluntarily. *See Nelson*, 121 F.3d at 833. But the evidence in this case is undisputed that when Gamboa's statements were obtained,

he (a) was represented by counsel, (b) chose to confess his crimes to Colombian prosecutors without being psychologically intimidated into doing so, (c) was not physically abused, and (d) was induced to make the statements by the desire to obtain leniency (and perhaps to avoid extradition). Under the circumstances, we do not find that the statements were made involuntarily or that Gamboa's privilege against self-incrimination would otherwise be violated by admitting them.

■ Gamboa also attacks the "fundamental unfairness" that would result from the use of his statements at trial. He entered into discussions with Colombian prosecutors under the assumption that Colombia would not use his statements against him in a Colombian prosecution should an agreement on charges fail to be reached.[4] The United States, says Gamboa, has acted as an "interloper to exploit the unconsummated bargain which led Gamboa to waive his right to remain silent."

The cases cited to us by Gamboa, however, stand only for the proposition that the United States must honor *its own* commitments made during plea negotiations. *See, e.g., United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1990) (noting that cooperation agreements may be analyzed under principles borrowed from the law of contracts and that, under those principles, the government is not at liberty to "turn its back" on promises it has made to a defendant in such an agreement). But, even if Colombia promised Gamboa that the *United States* would not use any statements obtained under the anticipated sentencing

---

**4.** Whether Colombian law would bar the use of these statements in its own prosecution of Gamboa was an issue the district court considered. After stating that it could not issue a ruling on this question based on the record before it, the court below stated that the weight of the evidence supported Gamboa's

claim that he had been advised that the statements could not be used in a future Colombian prosecution and that the statements in fact would not be so used. For the purposes of this opinion, we assume without deciding that the statements would have been inadmissible in a Colombian prosecution of Gamboa.

process—a circumstance not alleged by Gamboa to be the case here—it is by no means clear that the United States would be bound by the agreement.[5] And certainly, an agreement between Colombia and Gamboa that the statements would not be used in a *Colombian* prosecution cannot prohibit the United States from using them in a domestic court. *Cf. In re Drayer,* 190 F.3d 410, 412–13 (6th Cir.1999) (A cooperation agreement between an individual and Canada did not bar the United States from allowing him to be extradited to Canada, since the United States was not a party to the agreement and since there was no evidence that the agreement was made under the authority of the United States.); *United States v. Fuller,* 149 F.Supp.2d 17, 22–23 (S.D.N.Y.2001) (A cooperation agreement made with a county prosecutor, which expressly did not bind other government agencies, was not binding on the federal government.).

We note that we have not been presented with any evidence that the United States played any role whatever in obtaining the statements Gamboa made to Colombian authorities. Were there indications that Colombia obtained the statements on behalf of the United States or that the United States was otherwise substantially involved with Colombia in planning the discussions Colombia held with Gamboa, a much more serious and difficult question would confront us. *Cf. United States v. G.P.S. Auto. Corp.,* 66 F.3d 483, 494 (2d Cir.1995) (describing an exception when one sovereign acts "as a tool of the other" to the usual rule that two sovereigns may separately prosecute a defendant for the same offense without violating the Double Jeopardy Clause, and citing *Bartkus v. Illinois,* 359 U.S. 121, 123–24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), which first noted the possibility of this exception to the dual sovereignty doctrine). Because that situation is not before us, we express no opinion on it.

### Conclusion

We have considered all of Appellee's arguments and have found them meritless. The order of the district court suppressing the statements made by Appellee to Colombian prosecutors is therefore REVERSED and the case is REMANDED to the district court for trial. The mandate shall issue forthwith.[6]

---

**5.** We express no view as to whether, in such a case, a defendant might have recourse in the courts of the foreign jurisdiction to enforce the agreement. The case might be different, of course, if the United States in some way encouraged the assurance or was in other ways a party to it.

**6.** On appeal, Gamboa moved to strike the government's Reply Brief in its entirety, because the addendum to that brief and the arguments in the brief that reference the addendum rely on documents not in the district court record. Since we have had no need to consider the addendum or any arguments relating to it, we deny Gamboa's motion as moot.