# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2017

No. 16-3876-cr

UNITED STATES,
*Appellant*,

v.

JOHN HAAK,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of New York

ARGUED: OCTOBER 4, 2017
DECIDED: MARCH 7, 2018

Before: RAGGI, HALL, CARNEY, *Circuit Judges*.

On appeal from a suppression order entered in the United States District Court for the Western District of New York (Vilardo, *J.*; McCarthy, *M.J.*), the United States challenges the court's determination that defendant's statements were coerced in violation of the Fifth Amendment by a law enforcement officer's false promise of immunity in return for cooperation.

REVERSED AND REMANDED.

———————

> JAMES P. KENNEDY, JR. (Frank T. Pimentel, Assistant United States Attorney, *on the brief*), United States Attorney for the Western District of New York, Buffalo, New York, *for Appellant*.
>
> DAVID R. ADDELMAN, David R. Addelman, P.C., Buffalo, New York, *for Defendant-Appellee*.

———————

REENA RAGGI, *Circuit Judge*:

Defendant John Haak stands indicted in the United States District Court for the Western District of New York (Lawrence J. Vilardo, *Judge*; Jeremiah J. McCarthy, *Magistrate Judge*) on one count of possession with intent to distribute and distribution of the controlled substance fentanyl resulting in death. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C). The United States here appeals from the district court's October 18, 2016 order suppressing statements that Haak made to law enforcement authorities in the course of a non-custodial interview on March 4, 2015. *See United States v. Haak*, 215 F. Supp. 3d

218 (W.D.N.Y. 2016). The district court concluded that the statements had been coerced in violation of the Fifth Amendment by a police detective's false promise of immunity from prosecution in return for cooperation. *See id.* at 231; U.S. Const., amend. V. Upon review of the totality of the circumstances as reflected in a videotape recording of the interview at issue, we conclude that Haak's statements cannot be deemed coerced. We, therefore, reverse the challenged suppression order and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

### I. Haak's Non-Custodial Statements to Authorities

#### A. Haak Voluntarily Comes to the Police Station

In early March 2015, Hamburg, New York police officers, working on a joint federal-state task force with United States Drug Enforcement Administration ("DEA") agents, were investigating the February 28, 2015 death of James Forness from an apparent overdose of heroin laced with fentanyl. From a review of text messages found on Forness's cell phone, the police had identified defendant John Haak as Forness's likely drug supplier. Accordingly, they contacted Haak and asked him to come to the police station. Haak voluntarily did so on March 4, 2015, driving to the station in his own car and leaving approximately forty minutes later. The parties agree that Haak was never in custody throughout this time.

#### B. The Overall Context of the Interview

At the station, Haak met with Detective Sergeant Glenn Zawierucha and another officer not identified in the record. The

meeting, which was held in a standard interview room and lasted slightly over one-half hour, was video-recorded. Thus, neither the conversational tone of the encounter, nor the conduct of the participants, nor the actual words spoken are disputed. We nevertheless describe the interview in some detail to facilitate our discussion herein of why it does not manifest coerced statements.

The video recording shows that the officers were dressed in casual street clothes with no weapons visible. Meanwhile, Haak was not handcuffed or otherwise restrained during the interview. Rather, all three men simply sat in chairs across from or perpendicular to one another.

Zawierucha, who conducted the interview, introduced himself, stating both his rank within the Hamburg police department and his assignment to a joint police-DEA task force. Zawierucha told Haak that he wanted to speak with him and that Haak "owe[d] it to [him]self to at least listen to what [the detective] ha[d] to say." Video Recording, Mar. 4, 2015, at 13:20:23.[1] Then, even though Haak was not in custody, Zawierucha advised him of certain *Miranda* rights, first confirming that Haak was familiar with such rights from a prior arrest. *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966) (identifying warnings that should be given preliminary to custodial interrogation). The detective told Haak that he had (1) "the right to remain silent; you don't even have to talk to me," Video Recording, Mar. 4, 2015, at 13:20:45; (2) the right "to speak with an attorney; you can talk to one if you want before you talk to me; if you can't afford

---

[1] The parties did not prepare a transcript of the video recording, which presents no audibility problems. Accordingly, the statements quoted here are drawn from the court's own review. Any differences between these quotations and those of the district court are minor and immaterial to resolution of this appeal.

one, one will be provided for you," *id.* at 13:20:48; and (3) the right "anytime" to "end this whole conversation" and "walk out of here," *id.* at 13:20:57.[2] Zawierucha then stated that Haak had come in "on [his] own," and that the police would not be "keeping [him]"; they just wanted "to talk" to him. *Id.* at 13:21:02.

After confirming that Haak had understood everything said thus far, Zawierucha asked if Haak had any idea why police wanted to talk with him. Haak replied that he did not, other than to assume that the police wanted his help "busting somebody." *Id.* at 13:21:21. After a brief, casual exchange about persons known to both men, Zawierucha reiterated to Haak that he just wanted to have a conversation and that Haak owed it to himself to hear what the detective had to say. Zawierucha assured Haak that he would not "blow smoke" or "bulls—t" him, and that Haak could make "whatever decision you want to make, and we'll go from there." *Id.* at 13:22:14. "In any case," Zawierucha assured Haak, "you're walking out of here today"; "nobody is sandbagging you." *Id.* at 13:22:23. Haak nodded his head affirmatively during this exchange and, when asked, said he understood.

## C. Haak's Initial Inculpatory Statements

Zawierucha then came to the point of the interview: "Obviously, you're familiar with James Forness." *Id.* at 13:22:33. Haak agreed, whereupon Zawierucha asked him if he knew what had happened to Forness. Appearing surprised by the question, Haak said, "No, what happened to him?" *Id.* at 13:22:45. Rather than

---

[2] As the district court observed, the *Miranda* warning that Zawierucha neglected to give Haak was that anything he said could be used against him.

answer that question, Zawierucha asked Haak when he last spoke with Forness, to which Haak replied, "a week ago, . . . Thursday or Friday." *Id.* at 13:22:54. Pressed as to whether it could have been Saturday, Haak replied, "No." *Id.* at 13:23:04.

Zawierucha then told Haak that police had reviewed his cell phone records as well as Forness's text messages and—urging Haak "just [to] sit and listen to me"—stated, "obviously, you've been supplying him with some heroin." *Id.* at 13:24:08. Haak nodded, whereupon Zawierucha reiterated, "No secret." *Id.* at 13:24:14. Zawierucha then started to quote a text message from Haak to Forness on the Saturday afternoon of the latter's death in which—responding to a text message from Forness saying, "This is good stuff"—Haak told Forness, "Be careful with it because [it has] fentanyl in it." *Id.* at 13:24:28. Zawierucha said he would "imagine [it was] a mixture," to which Haak responded, "I don't know. It might have been." *Id.* at 13:24:32. When a moment later, Zawierucha repeated, "you did tell him to be careful with it, because he said it's good stuff," Haak nodded agreement. *Id.* at 13:24:42.

Zawierucha then told Haak what had happened to Forness, specifically, that on the Saturday these text messages were exchanged, Forness had died from an overdose of fentanyl. Haak stated, "I had no idea." *Id.* at 13:25:01. Zawierucha then told Haak, "You were the last person he was actually texting, and the heroin that he shot up came from you." *Id.* at 13:25:03. Haak first replied, "No, it didn't," *id.* at 13:25:12, but when Zawierucha maintained that telephone records and text messages showed "it did," *id.* at 13:25:23, Haak said, "Okay," *id.* at 13:25:24.

6

### D. The Police Statements at Issue

Only at that point, approximately five minutes into the interview, and after Haak had already inculpated himself in supplying the drugs that killed Forness, did Zawierucha make any of the statements that the district court identified as coercive. We here italicize these statements in detailing the ensuing conversation.

Urging Haak to "sit back and take a breath," *id.* at 13:25:27, which Haak did, Zawierucha told him, *"I'm not trying to screw with you. I'm just trying to set some facts. Okay?,"* *id.* at 13:25:30. Haak said, "Okay," *id.* at 13:25:33, whereupon Zawierucha continued, "You didn't mean to do anything to him. You sold him the heroin. I get that. I get it. But your plug [*i.e.*, source] with the heroin. Okay. You got a couple of choices you can make right now," *id.* at 13:25:36. Haak nodded his head affirmatively as Zawierucha was speaking. The following exchange then occurred:

> Zawierucha: There's a multi-county, federal investigation where people are gonna get wrapped up in a conspiracy charge for distributing heroin containing fentanyl. Primarily the people that are the direct people that distributed this, especially if it caused a death, are gonna be the number one targets.
>
> Haak: Okay.
>
> Zawierucha: You don't need this s—t.
>
> Haak: No, I don't.

*Id.* at 13:25:50.

After a brief, unrelated exchange about a case known to Haak in which Zawierucha revealed himself to have been the arresting officer, Zawierucha continued,

> *I'm not looking to screw you over, not looking even to come after you on this.* But you need to make a conscious decision. Okay? I told you you're walking out of here. You are walking out of here. But there's a death investigation that this department here is investigating along with the Drug Enforcement Administration, caused by heroin containing fentanyl that you sold to the deceased.

*Id.* at 13:26:35. As Haak nodded his head, Zawierucha told him, "Technically, could look very bad for you. My assumption is there was no intent on this." *Id.* at 13:27:01.

Zawierucha then asked Haak again whether he had known of Forness's death. When Haak answered, "No, I, honest to God, didn't," Zawierucha told him, "I believe you." *Id.* at 13:27:10. The detective then reiterated,

> *I'm not looking to mess with you, I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you.* But you obviously got this from somebody. Okay.

*Id.* at 13:27:17. Haak continued to nod his head.

Zawierucha then told Haak that heroin-related deaths were increasing and that law enforcement knew that some of the fentanyl being mixed with heroin came from a common Mexican source. Zawierucha said he was looking for Haak's "cooperation on this so

we can backtrack this and hopefully prevent some deaths."  *Id.* at 13:28:11.

Zawierucha then reviewed some of the text message evidence inculpating Haak in Forness's death, including a 2:30 p.m. message indicating that Haak was then en route to deliver the fatal drugs to Forness.  Asked if that sounded familiar, Haak said it did, except that he "thought it was Friday."  *Id.* at 13:29:05.  Zawierucha said he would check the date, but continued,

> The heroin you sold [Forness], that you directly sold him, I'm just—no if, ands or buts about it, okay?  That was, it came from you.  He's dead because he shot it into his veins.  And that's why I asked you if it had fentanyl in it.  Now obviously you've got a plug that you got it from.  That's how you're supporting yourself.

*Id.* at 13:29:21.  Haak said he was "not really" making money dealing drugs.  *Id.* at 13:29:44.  Asked if he was using heroin himself, Haak admitted using one or two bags a day, some of it containing fentanyl.  The following exchange then ensued:

> Zawierucha:  Alright, now here's the thing.  I'm going to ask you, and it's your call.  *Either you can get on board, put the team jersey on here, play for this team, or you can be on the losing team.*
>
> Haak (laughing):  I don't want to be on that team.
>
> Zawierucha:  No?  I'm just telling you, it's as simple as that.  I'm making an analogy here.  I'm looking for your cooperation on this.  *But you're going to save yourself a world of hurt.*  Alright?  Who's your plug?

*Id.* at 13:30:16.

### E.  Haak Identifies Two of his Drug Suppliers

Haak then identified his source as "Fran," a male a little older than he whose last name he did not know but whose phone number he provided. *Id.* at 13:30:57. Haak stated that Fran dealt from various locations, including Center Road and West Seneca Street. Haak explained that he had only started dealing directly with Fran some four days earlier. The drugs he sold to Forness had come from Fran through Haak's friend Mark Schukraft.

Asked how much heroin he had sold Forness, Haak said, "four or five bags." *Id.* at 13:34:39. Asked if those were the drugs he had told Forness to be careful with, Haak replied, "Yeah." *Id.* at 13:34:45. Haak said he charged Forness $10 per bag. When Zawierucha said the price was cheap, Haak remarked that he had sold the heroin for cost, making no money on the deal. Asked if he was with Mark when he acquired the heroin from Fran, Haak stated that he had driven Mark to the transaction. Asked what Mark told him about the heroin, Haak said he told him to "be careful" because it was "strong," and "he thinks it might have fentanyl in it." *Id.* at 13:36:15.

### F.  Soliciting Haak's Cooperation in a Controlled Buy

Zawierucha then told Haak that news of Forness's death was "going to get out," but should not get out through Haak: "Don't go spreading the word." *Id.* at 13:36:51. Zawierucha quickly assured Haak that Forness was, in fact, dead; that Haak was "not getting sandbagged." *Id.* at 13:37:14. Haak told Zawierucha he believed him, whereupon the detective observed that he had told Haak at the start, "You came in on your own; you're going to leave on your own." *Id.*

10

at 13:37:18. Zawierucha then observed that Haak had stated that he was willing to help the police and "forward some investigations for the greater good of cleaning up your town, which is probably the right thing to do." *Id.* at 13:37:27. Haak nodded and said, "Yeah. Mm hmm." *Id.* at 13:37:33.

As Zawierucha started to move to another point, Haak looked at his cell phone and observed that he had to get his car home for his mother, who had a "hair appointment" that afternoon. *Id.* at 13:38:01. Zawierucha assured Haak they were not going to keep him much longer and asked if Haak could give them another "five or eight minutes." *Id.* at 13:38:07. Haak replied, "Oh yeah, yeah." *Id.* at 13:38:08.

Zawierucha then discussed Haak making a controlled purchase of heroin from Fran, asking the largest amount Haak thought he could obtain: "Could you get a bundle?" *Id.* at 13:38:26. Haak replied that Fran usually "deals in half-grams or grams." *Id.* at 13:38:29. Asked if that was how he had obtained the heroin from Fran, *i.e.*, in grams that he then bagged up himself, Haak stated, "I didn't. No. Mark did it." *Id.* at 13:38:40. Haak then described how Mark re-packaged the heroin. Asked how often he had accompanied Mark to buy heroin, Haak said he had done so "a bunch . . . a couple of dozen [times], at least." *Id.* at 13:39:22. When Zawierucha stated, "but this was the first time from this Fran," Haak corrected him, "No, no, we usually get it from Fran," with whom they had been dealing for "a couple of months." *Id.* at 13:39:28. Haak further stated that Fran was now "cool with me," such that Haak could "go in alone" to make a purchase. *Id.* at 13:39:42. Zawierucha then said to Haak, "I'm going to assume since you put on the team jersey you're willing to do that [*i.e.*, make a purchase] because you're the one that's going to benefit in this by

11

your cooperation.  Am I correct to assume that?"  *Id.* at 13:39:47.  Haak replied, "Yes."  *Id.* at 13:39:57.

For the final ten minutes of the interview, Zawierucha and Haak discussed the anticipated controlled buy.  In the course thereof, Zawierucha asked Haak about his own heroin use and pressed him as to whether he had given heroin to anyone other than Forness, because "somebody else ends up dead, then you've got a problem."  *Id.* at 13:42:57.  Haak insisted that he had given drugs only to Forness.  He also denied knowing of any other persons to whom Mark had supplied heroin.

Zawierucha then told Haak,

Obviously, this isn't going to go away, this whole investigation.  Alright.  But I think you're doing the absolute right thing by getting on board and that's why I told you I think it behooves you to listen to what I had to say.  I'm not going to hold you up.  You need to be somewhere.  But here's the deal.  In the near future, . . . we're going to have you make one of these calls.  You have no problem doing that?

*Id.* at 13:48:26.  Haak said, "No."  *Id.* at 13:49:09.

Zawierucha again pressed Haak as to any other persons who might have received fentanyl-laced heroin, and Haak again denied such knowledge.  Zawierucha then emphasized the danger to Haak himself in using heroin containing fentanyl.  The men's final exchange was as follows:

Zawierucha:  [M]ost likely, you're not going to get pulled into this thing because you're helping us.  Okay?  And

12

> I'm assuming you're on board, and you want to help us because it's the right thing to do.
>
> Haak:  Yeah.
>
> Zawierucha:  So nobody else dies from this s—t.
>
> Haak:  Absolutely.

*Id.* at 13:52:11.   The men then stood up and shook hands, with Zawierucha saying they would "be in touch," and Haak laughing as he said, "Well, you have my number, obviously."  *Id.* at 13:52:49. Haak then left the police station.

## II.  Haak Arranges Two Controlled Buys and Is Then Charged by Federal Authorities with Drug Trafficking

Over the next few days, Haak, working under the direction of law enforcement authorities, arranged for two controlled purchases of heroin from Francis ("Fran") Tessina, who was then arrested.  On March 10, 2015, six days after the interview detailed above, a federal complaint was filed charging both Haak and Tessina with distributing and conspiring to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Nine months later, on December 1, 2015, a federal grand jury indicted Haak on the fentanyl possession and distribution resulting in death charge now pending in this case.[3]

---

[3] On July 1, 2015, Tessina was indicted for possessing with intent to distribute and distributing heroin and fentanyl on March 9 (Count One), and possessing with intent to distribute heroin and fentanyl on March 10 (Count Two), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  *See United States v. Tessina*, No. 1:15-cr-00130-LJV-JJM-1, Dkt. No. 11. Tessina pleaded guilty to both counts on March 29, 2017, and is awaiting sentencing.  *See id.*, Dkt. Nos. 59 (minute entry), 94 (transcript).  While Haak asserts that Tessina "entered into a plea agreement with the Government," Appellee's Br. at 4, the plea transcript indicates that he did not, *see United States v. Tessina*, No. 1:15-cr-00130-LJV-JJM-1, Dkt. No. 94 at 21.

## III. District Court Proceedings

Before the district court, Haak filed an omnibus pre-trial motion seeking, among other things, to suppress his March 4, 2015 statements to Detective Zawierucha. Haak argued that (1) he was not properly advised of his *Miranda* rights in that he was not told that if he could not afford an attorney, one would be appointed for him; and (2) his statements were coerced by the threat that "'the weight of the federal government would fall on him'" if he did not cooperate. Govt. App'x 30–31.

Magistrate Judge McCarthy, to whom all pre-trial matters were assigned, concluded that neither of Haak's arguments warranted suppression, the first, because the video recording showed that Zawierucha did provide the allegedly omitted warning; and the second, because the magistrate judge identified no impropriety in threatening a defendant with prosecution if he did not cooperate. Nevertheless, the magistrate judge ordered further briefing as to the voluntariness of Haak's statements in light of Zawierucha's interview representations that he was "'*not trying to screw with* [Haak],'" "'*not even looking to come after* [him] *on this.*'" Request for Additional Briefing at 4–5 (emphasis in original). The magistrate judge also expressed concern that Zawierucha had told Haak that "'the weight of the federal government [would] come down' on him *only if he remained silent,*" and had referenced cooperation as "'putting on the team jersey'" and "'playing for this team'" because, in the magistrate judge's view, "who in their right mind would reasonably expect that if they did so (by speaking up rather than remaining silent), they would end up being prosecuted by their own 'team'?" *Id.* at 5 (emphasis in original).

14

After receiving additional briefing, the magistrate judge recommended that the district court suppress Haak's March 4, 2015 statements as involuntary because they were induced by Zawierucha's false promise that, if Haak cooperated, "he would not be prosecuted." Report & Recommendation, July 8, 2016, at 11.

The government filed objections to the magistrate judge's report with the district court, which rejected them and granted Haak's suppression motion. *See United States v. Haak*, 215 F. Supp. 3d at 222. Like the magistrate judge, the district court concluded that Zawierucha falsely "promised that in exchange for Haak's cooperation, he would not be charged." *Id.* at 228. The district court acknowledged that Zawierucha had not made such a promise "in so many words"; nevertheless, it concluded that the message was "loud, clear, and unmistakable." *Id.* While acknowledging that all other circumstances weighed in favor of voluntariness, the district court determined that the implied promise of immunity overbore Haak's will and rendered his statements involuntary. *See id.* at 230.

The government timely appealed, invoking this court's jurisdiction pursuant to 18 U.S.C. § 3731.

## DISCUSSION

### I.   Standard of Review

On appeal from a challenged suppression order, we review a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo*. *See United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015). Because the March 4, 2015 interview was video-recorded, this case presents no disputes of fact as to the actions taken, words spoken, or demeanor

15

displayed by Detective Zawierucha or defendant Haak during that non-custodial encounter. The parties dispute only the legal significance of certain words spoken by Zawierucha, specifically, whether those words equated to a promise of immunity from prosecution and whether that promise overbore Haak's will so as to render the challenged statements constitutionally involuntary.

We review the legal significance of undisputed facts *de novo*. *See United States v. Bohannon*, 824 F.3d 242, 248 (2d Cir. 2016) (reviewing suppression order *de novo* where government challenged application of Fourth Amendment legal standard to undisputed facts); *United States v. Davis*, 326 F.3d 361, 365 (2d Cir. 2003) (reviewing motion to suppress ruling *de novo* where "parties do not dispute the relevant facts, but rather whether those facts gave rise to an unlawful search and seizure"); *see also United States v. Crumpton*, 824 F.3d 593, 604, 607 (6th Cir. 2016) (stating, in determining adequacy of *Miranda* warnings and whether defendant's waiver was knowing and voluntary, "[g]iven the undisputed words that were said and the undisputed recording of them," "the question before us is a legal one" and insofar as "district court drew inferences from the undisputed transcript and audio recording," "those inferences speak to the legal effect of the words that were said," making "[d]e novo review . . . applicable"); *United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012) (stating, in evaluating whether defendant invoked right to counsel during videotaped interview, that dispute concerning "legal effect" of undisputed words spoken is "question of law").

## II.    Haak's Statements Should Not Have Been Suppressed

When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue

before the court is whether the statements were voluntary, *i.e.*, the "product of an essentially free and unconstrained choice by [their] maker," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotation marks omitted), or coerced by police activity in violation of constitutional rights not to incriminate oneself and due process, *see* U.S. Const., amends. V, XIV; *United States v. Allen*, 864 F.3d 63, 80 (2d Cir. 2017) (stating that "Supreme Court has 'recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self–incrimination and the Due Process Clause of the Fourteenth Amendment'" (quoting *Dickerson v. United States*, 530 U.S. 428, 433 (2000))).

While "coercive police activity" is a "necessary predicate" to holding a confession constitutionally involuntary, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), a finding that police conduct is "false, misleading, or intended to trick and cajole the defendant into confessing" does not necessarily render the confession involuntary, *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  A court must still make "specific findings . . . that under the totality of the circumstances . . . the defendant's will was overborne by the [police] conduct."  *Id.*; *see United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) (identifying "key" question to voluntariness is "whether the subject's will was overborne" (internal quotation marks omitted)). The totality of circumstances generally fall into "three sets of circumstances:  (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988); *see United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) (observing that, whether voluntariness requirement derives from Due Process Clause

or Fifth Amendment right against self-incrimination, "test for voluntariness is well established and multi-faceted").

With these principles in mind, we consider the district court's conclusion that the third of these sets of circumstances, the conduct of law enforcement officers in falsely promising Haak immunity from prosecution, overbore Haak's will and rendered his March 4, 2015 statements involuntary.

### A. Haak's Statements Made Before the Purported Promise of Immunity Cannot Be Deemed Involuntary

At the outset, we note that the first statements by Detective Zawierucha that the district court identified to imply a promise of immunity were made some five minutes into the recorded interview, specifically at Video Recording, Mar. 4, 2015, 13:25:30, when the detective said, "I'm not trying to screw with you." By that time, however, Haak had already made statements or given signs that a jury could deem inculpatory. For example, when Zawierucha told Haak that his own phone records together with Forness's text messages showed that "obviously, you've been supplying him with some heroin," Haak nodded his head in what could be understood as agreement. *Id.* at 13:24:08. He also nodded his head when Zawierucha twice attributed to him a text message received by Forness on the afternoon of his death, telling him, "[b]e careful with it" in response to Forness's comment that "[t]his is good stuff." *Id.* at 13:24:28. Haak then changed his answer from, "No, it didn't," *id.* at 13:25:12, when Zawierucha stated that the heroin that Forness "shot up came from you," *id.* at 13:25:03, to "Okay," *id.* at 13:25:24, when Zawierucha told him that telephone records and text messages showed that "it did," *id.* at 13:25:23.

18

Thus, even on the district court's theory of coercion, there was no basis to identify these exchanges, or any others occurring before the purported promise of immunity, as involuntary. *See Colorado v. Connelly*, 479 U.S. at 167. That alone warrants reversal of the suppression order to the extent it pertains to the part of the video recording before 13:25:30.

For reasons we proceed to explain, however, the totality of the circumstances fails to show that any of Haak's March 4, 2015 statements was constitutionally involuntary and, thus, we reverse the suppression order in its entirety.

**B.     The Totality of Circumstances Does Not Show that Haak's Will Was Overborne by a False Promise of Immunity**

This court has recognized that "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will," *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), insofar as "they overcome his desire to remain silent," *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002). A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers. This is particularly so with respect to promises of leniency. *See id.* ("[V]ague promises of leniency for cooperation . . . generally will not, without more, warrant a finding of coercion."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *see also United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

Acknowledging this precedent, the district court construed Detective Zawierucha's statements to Haak as more than vague promises of leniency. Rather, the district court concluded that Zawierucha's statements sent a "loud, clear, and unmistakable" message that "in exchange for Haak's cooperation, he would not be charged." *United States v. Haak*, 215 F. Supp. 3d at 228. In short, in the district court's view, Zawierucha secured Haak's cooperation through a false promise of immunity from prosecution, which promise overbore Haak's desire to remain silent. The totality of the circumstances does not support this conclusion.

### 1.    Zawierucha Did Not Promise Haak Immunity

To support its conclusion that Haak was coerced into making incriminating statements by a promise of immunity, the district court relied on the various statements highlighted in this opinion's Background section. *See supra* pp. 7–10. As the district court acknowledged, none of the statements promise Haak "in so many words" that he will not be charged with any crime if he cooperates with the police. *United States v. Haak*, 215 F. Supp. 3d at 228. Nevertheless, the court concluded that such a promise could be implied. In fact, the only highlighted statements providing any support for that conclusion are Zawierucha's assertions that he was not looking "to come after" Haak. Video Recording, Mar. 4, 2015, at 13:26:35 (". . . not looking even to come after you on this"); *id.* at 13:27:17 ("I'm not looking to come after you"). All other highlighted statements, by themselves, do not imply immunity in return for cooperation.

For example, Zawierucha's initial statement that "I'm not trying to screw with you," *id.* at 13:25:30, when viewed in context,

communicates that Zawierucha was not attempting to deceive Haak about either Forness's death from fentanyl-laced heroin or the evidence that showed Haak to be the person who had directly supplied the deadly drug to Forness.[4] Indeed, throughout the interview, Zawierucha emphasized to Haak that Forness really was dead and that the detective was not "sandbagg[ing]" Haak as to that. *Id.* at 13:37:14.[5] Thus, Zawierucha's statements that he is "not looking to screw you over," *id.* at 13:26:35, and "not looking to mess with you," *id.* at 13:27:17,[6] are more reasonably understood as assurances of truthfulness and fair dealing than as promises of immunity.

To be sure, the last two statements are followed by Zawierucha's assertions that he is "not looking even to come after you on this," *id.* at 13:26:35, and "I'm not looking to come after you," *id.* at 13:27:17. Assuming these statements might be construed in some contexts as a promise of immunity, that is hardly their only, or most reasonable, construction here. How a police officer generally "comes after" someone is by placing him under arrest.[7] Here, Zawierucha repeatedly emphasized to Haak that he was not being placed under arrest. Police were not "keeping" him that day, *id.* at 13:21:02, and

---

[4] *See generally* Cambridge English Dictionary, https://dictionary.cambridge.org/us /dictionary/english/screw (last visited Feb. 22, 2018) (including "deceive someone" among American slang meanings of "screw").

[5] *See generally* Merriam-Webster Learner's Dictionary, http://www.learnersdictionary.com/ definition/sandbag (last visited Feb. 22, 2018) (stating "sandbag" is "used figuratively to describe treating . . . someone unfairly").

[6] *See generally* Longman Dictionary of Contemporary English, https://www. ldoceonline.com/dictionary/mess-with (last visited Feb. 22, 2018) (including "to deceive" among meanings of phrasal verb "to mess with somebody / something").

[7] *See generally* Merriam-Webster Dictionary, https://www.merriam-webster.com /dictionary/come%20after (last visited Feb. 22, 2018) (including "to try to find or capture (someone you want to hurt or punish)" among meanings of phrasal verb "come after").

Haak would be "walking out of" the station, which is in fact what occurred, *id.* at 13:22:23; *see id.* at 13:26:35; 13:37:20; 13:38:00; 13:48:38. Viewed in this context, the "not looking to come after you" statements are most reasonably understood to communicate that Zawierucha had no present intent to arrest Haak, not that he was promising him immunity from prosecution. Indeed, forbearance of arrest does not foreclose future prosecution on indictment or information. While police can promise the former, only prosecutors can promise immunity from the latter. This is not to deny the possibility of police exceeding their authority by improperly promising immunity. It is simply to explain why such an improper promise should not readily be implied here where (1) the words spoken—"not looking to come after you"—can also signify forbearance of arrest, within police authority; (2) police honored their promise not to arrest Haak; and (3) all other circumstances indicate a "routine, benign, and noncoercive" interview, *United States v. Haak*, 215 F. Supp. 3d at 228 (internal quotation marks omitted); *see infra* pp. 27–30.

That conclusion is further supported by the fact that Zawierucha effectively explained to Haak the reason he was not then looking to arrest him: Haak was not among the "number one targets" of an ongoing federal-state investigation into a larger scheme for the distribution of fentanyl-laced heroin. Video Recording, Mar. 4, 2015, at 13:25:50. That hardly communicated to Haak that he would never be charged for his own criminal conduct. Indeed, Zawierucha told Haak that his situation was very serious; he was caught up in a "death investigation," *id.* at 13:26:35, and evidence that he sold fentanyl-laced heroin to the deceased—which evidence Zawierucha had already detailed for Haak—"could look very bad for you," *id.* at 13:27:01. Nevertheless, Zawierucha told Haak that the detective assumed Haak

had not foreseen or intended death. It was in that context that Zawierucha told Haak, "I'm not looking to mess with you, I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you." *Id.* at 13:27:17. The message being communicated was, thus, threefold: (1) Zawierucha had told Haak the truth about both Forness's death and the evidence inculpating Haak in that death ("I'm not looking to mess with you"); nevertheless, (2) Zawierucha was not then going to arrest Haak ("I'm not looking to come after you"); but (3) Haak should not expect to remain at liberty if he chose not to cooperate; rather, he would be prosecuted to the full extent of federal law ("but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you"). The statements do not promise immunity.

The district court nevertheless concluded that when the last two pronouncements are read together, they clearly offered Haak a binary choice between having the weight of the federal government come down on him or facing no charges at all in return for cooperation. *See United States v. Haak*, 215 F. Supp. 3d at 229. This binary construction is far from clear and unmistakable when Zawierucha's "not looking to come after you" statement, Video Recording, Mar. 4, 2015, at 13:27:17, is construed, as we have already explained, to reference forbearance of arrest rather than immunity from prosecution. Nor is a different conclusion warranted by the detective's assertion that the full weight of the federal government would come down on Haak if he chose not to cooperate. As the magistrate judge recognized in rejecting Haak's threat challenge to this statement, *see supra* p. 14, there is nothing improper in police

23

truthfully telling a defendant that he will be prosecuted to the full extent of the law if he chooses not to cooperate. *See United States v. Pomares*, 499 F.2d 1220, 1221–22 (2d Cir. 1974) (concluding that it was neither unfair nor overreaching for agents soliciting cooperation to tell defendant that he faced "heavy penalties"); *accord United States v. Bye*, 919 F.2d 6, 9–10 (2d Cir. 1990); *see also United States v. Braxton*, 112 F.3d 777, 782 (4th Cir. 1997) (stating that "[t]ruthful statements" about defendant's "predicament are not the type of 'coercion' that threatens to render a statement involuntary" (alteration in original) (internal quotation marks omitted)).[8] More to the point, such statements do not imply a promise of immunity in return for cooperation. *See United States v. Braxton*, 112 F.3d at 782–83 (ruling officer's statement "'[i]f you're not coming clean . . . you can do five years,'" was "simply not an implied promise of non-prosecution" and did not suggest that if defendant "did 'come clean' he would not face jail time" (internal quotation marks omitted)).

In sum, neither the words spoken by Detective Zawierucha nor the context in which he spoke them communicated a clear and unmistakable promise of immunity in return for cooperation. Haak was promised that he would not be arrested that day but, rather, would be allowed to go home. What other consideration he would receive for cooperation was left unspecified and, thus, cannot be deemed coercive. *See United States v. Gaines*, 295 F.3d at 299; *United States v. Jaswal*, 47 F.3d at 542.

This conclusion is only reinforced by the fact that, at the end of the interview, Zawierucha told Haak that "this [investigation] isn't going to go away." Video Recording, Mar. 4, 2015, at 13:48:26.

---

[8] Thus, to the extent Haak's brief might be construed to revive his threat challenge, the argument fails on the merits.

Zawierucha did state that Haak "most likely" was "not going to get pulled into this thing because you're helping us." *Id.* at 13:52:11. Neither Haak nor the district court, however, cite this statement as communicating a promise of immunity. This is not surprising. Something that is "most likely" to occur is not certain to occur. Thus, the statement, at most, communicates a possibility, not a promise. Moreover, "not going to get pulled into this thing" does not necessarily equate to not going to be charged at all. It could as easily indicate that Haak would most likely not be charged in the larger heroin-with-fentanyl conspiracy that was the focus of investigation.

Nor can a clear promise of immunity be implied from Zawierucha's employment of a "team" analogy to frame Haak's cooperation choice: "[e]ither you can get on board, put the team jersey on here, play for this team, or you can be on the losing team. . . . I'm looking for your cooperation on this. But you're going to save yourself a world of hurt." *Id.* at 13:30:16. In concluding otherwise, the magistrate judge asked, "who in their right mind would reasonably expect that if they did so (by speaking up rather than remaining silent), they would end up being prosecuted by their own 'team'?" Request for Additional Briefing at 5. The answer is the countless defendants who cooperate without immunity and with only an expectation that they will be allowed to plead to lesser charges or will be afforded an opportunity for a reduced sentence.

The district court also thought the team analogy implied a promise of immunity, highlighting Zawierucha's statement that "'you're gonna save yourself a world of hurt'" by joining what Haak "thought was the winning team," only to learn that "his teammates—led by team captain Zawierucha—had deserted him," when "[h]e was charged with a crime, and 'the weight of the federal government

25

[came] down on [him].'" *United States v. Haak*, 215 F. Supp. 3d at 229 (second and third alterations in original).  This reasoning does not persuade for two reasons.

First, the statement that Haak would save himself "a world of hurt" by cooperating with the government is hardly a promise of immunity.  As already observed, countless defendants who enter into cooperation agreements without immunity expect to save themselves "a world of hurt" in any number of respects, most related to reduced jail time.

Second, Zawierucha's "team" reference cannot imply a promise of immunity because the analogy is routinely used—by law enforcement officials, defense attorneys, even courts—to refer to cooperators generally, the vast majority of whom do not receive immunity.  *See, e.g.*, *United States v. Coronado*, No. 12-cr-83S, 2017 WL 2930573, at *12 (W.D.N.Y. July 10, 2017) (reporting exchange at which agent soliciting cooperation asked defendant whether he wanted agent to report to prosecutor that defendant was "on Team America, and my recommendation is we lessen the blow"); *Williams v. United States*, No. 00 Cr. 1008 (NRB), 2011 WL 3296101, at *13 (S.D.N.Y. July 28, 2011) (quoting summation in which defense attorney, attempting to discredit prosecution witness, stated, "Whose team is he playing for?  Team USA. . . . Conspiracy to murder, attempted murder, [he] could walk out with time served."); *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 338 (S.D.N.Y. 2008) (using analogy, court itself characterizes "notorious heroin dealer, Frank Lucas" as having "joined 'Team America'" in cooperating against high-level drug dealers); *United States v. Heatley*, 39 F. Supp. 2d 287, 297 (S.D.N.Y. 1998) (quoting defense counsel's assertion that he considered it "a sign that the government was 'considering [Heatley] a member of

Team USA already in asking for his help in bringing other people onto the team'" (alteration in original)). Cooperators who join the government's "team" may expect to benefit from their actions, but the usual benefit is leniency within a prosecution; it is not immunity from prosecution.

Thus, Zawierucha's solicitation of Haak to join the government team to "save yourself a world of hurt" did not imply immunity, either by itself or when considered together with Zawierucha's other highlighted statements.

### 2. The Totality of the Circumstances Does Not Demonstrate that Haak's Will Was Overborne by Police Conduct

In the absence of a false promise of immunity, there is no other support in the totality of circumstances for the challenged suppression order. Any ambiguity in the quoted police statements is not enough to demonstrate coercion because, as the district court recognized, and our own review of the undisputed facts confirms, both Haak's characteristics and the conditions of the interrogation weigh in favor of holding Haak's statements voluntary.

Haak is an adult and, as the district court observed, "[h]is actions before, during, and after" the recorded interview exhibit maturity and "at least average intelligence." *United States v. Haak*, 215 F. Supp. 3d at 227; *see United States v. Ruggles*, 70 F.3d at 265 (deeming statements voluntary where, *inter alia*, "there is nothing in the record to indicate that [defendant] lacks maturity, education or intelligence"). Haak's actions also exhibit attention to and understanding of what is being said during the interview. Moreover, as the district court noted, no circumstances suggest that Haak "is

27

prone to coercion." *United States v. Haak*, 215 F. Supp. 3d at 227. Indeed, nothing indicates any reluctance by Haak to speak with the police. To the contrary, Haak voluntarily went to the police station on the stated assumption that police were looking for his help prosecuting someone. When police told him they were investigating his suspected involvement in the drug death of James Forness, Haak inculpated himself in that matter even before police made any of the statements the district court identified as coercive. Moreover, before he made these statements, Haak, although not in custody, was advised of his rights to remain silent and not to talk with the police; to the assistance of counsel, appointed if necessary; and to halt the interview at any time and to leave the police station. While he was not told that anything he said to the police could be used against him, Haak had some familiarity with both the criminal justice system and the *Miranda* rights based on a past arrest. *See United States v. Ruggles*, 70 F.3d at 265 (considering defendant's "familiar[ity] with police questioning" in assessing voluntariness of statements); *Green v. Scully*, 850 F.2d at 902 (same). Thus, these personal circumstances strongly indicate that Haak's March 4, 2015 statements were voluntary.

The same conclusion obtains with respect to circumstances pertaining to the conditions of the interrogation. As noted, Haak was not in custody. He voluntarily came to the police station and knew from the outset that he did not have to speak with the police but, rather, could stop the interview at any time and walk out of the station. *See United States v. Ruggles*, 70 F.3d at 265 (concluding statements voluntary where, *inter alia*, defendant not in custody and told he "could leave at any time"). Haak met with police in a standard interview room. The interview itself was not unduly lengthy, lasting only a bit longer than one-half hour. *See Parsad v. Greiner*, 337 F.3d

175, 184 (2d Cir. 2003) (concluding confession voluntary where, *inter alia*, defendant not subjected "to extended periods" of uninterrupted questioning); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (determining statements made at one-hour interview were voluntary); *United States v. Guarno*, 819 F.2d at 31 (concluding statements made during two and one-half hour interview were voluntary); *see also United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) (recognizing "length of detention" relevant to voluntariness determination).

Two officers were present for the interview, both dressed in casual plain clothes and neither displaying any weapons. Haak himself was unrestrained throughout the interview. *See Parsad v. Greiner*, 337 F.3d at 184 (deeming confession voluntary where, *inter alia*, "detectives did not handcuff petitioner"); *Green v. Scully*, 850 F.2d at 902–03 (concluding confession voluntary where, *inter alia*, petitioner "was not handcuffed at any time during the interrogation"). As the district court observed and the video recording shows, the interview was conducted in a "conversational" and polite manner throughout, and bracketed at both the start and conclusion by "casual talk." *United States v. Haak*, 215 F. Supp. 3d at 228. In short, "it would be hard to imagine a more routine, benign, and noncoercive investigatory scenario." *Id.* (internal quotation marks omitted). Thus, the circumstances of interrogation also weigh heavily in favor of voluntariness.

The district court acknowledged that these two sets of circumstances "largely cut in favor of finding Haak's statements to be voluntary." *Id.* Nevertheless, it ordered suppression based on the police's "clear," "unmistakable," and "false" promise of immunity in return for Haak's cooperation. *Id.* at 228–29. The court concluded that

the promise overbore Haak's will, such that his statements were not "free and voluntary" acts. *Id.* at 230 (internal quotation marks omitted). We have already explained why the record will not support this conclusion. *See supra* pp. 20–27. To summarize, Haak voluntarily inculpated himself in the Forness drug death even before the purported promise of immunity, which precludes determining, as the district court did, that the promise was "the critical factor" in Haak's decision to speak to authorities. *United States v. Haak*, 215 F. Supp. 3d at 229. Further, the statements themselves do not clearly and unmistakably promise Haak immunity from prosecution. They are more reasonably understood in context to communicate that the police were not then planning to arrest Haak because their focus was on higher-placed persons in the fentanyl-laced heroin distribution chain. Insofar as police solicited Haak's cooperation against such persons, they made no promise that Haak would thereby avoid prosecution altogether. Rather, they urged him to join the government "team," a common analogy for cooperation generally that does not imply immunity.

In sum, even if there is any ambiguity in the quoted police statements as to the benefit Haak might derive from cooperation, the totality of circumstances does not manifest police coercion but rather weighs convincingly in favor of voluntariness. Accordingly, the suppression of Haak's statements as constitutionally involuntary is unwarranted.

## CONCLUSION

For the reasons stated, we conclude that the police did not falsely promise Haak immunity from prosecution in return for his cooperation. In the absence of such a promise, nothing in the totality

30

of circumstances demonstrates that Haak's will was overborne during his non-custodial police interview so as to render the statements he made at that time constitutionally involuntary. To the contrary, the totality of circumstances indicates that Haak's statements were voluntary.

Accordingly, the district court order suppressing Haak's March 4, 2015 statements is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.