22-826-cr
*United States of America v. Mendonca*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2022

Argued: June 26, 2023     Decided: December 6, 2023

Docket No. 22-826-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ANTHONY CHRISTOPHER MENDONCA,

*Defendant-Appellant.*

B e f o r e :

LYNCH, LOHIER and KAHN, *Circuit Judges.*

Defendant-Appellant Anthony Christopher Mendonca appeals his conviction following a jury trial in the Eastern District of New York (Cogan, *J.*) on one count of possessing child pornography. On appeal, Mendonca presents two separate challenges. The first targets the exclusion of the public from substantial

portions of his jury selection, which was constrained by stringent pandemic-era restrictions; the other targets the admission at trial of inculpatory statements that Mendonca argues were coerced by law enforcement's suggestion that he had "failed" a polygraph exam – not just as to his possession of child pornography, but as to the "hands on abuse of kids" – and associated threats and promises. Crucially, neither matter was properly preserved below. Thus, although we are troubled by aspects of both challenges, because neither can withstand our exacting standards governing plain-error review, we **AFFIRM** the judgment of the district court.

Judge LOHIER files an opinion concurring in the judgment and in Part II of the majority opinion.

---

GENNY NGAI, Assistant United States Attorney (Kevin Trowel, Marietou Diouf, Assistant United States Attorneys, *on the brief*), *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

SARAH BAUMGARTEL, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, *for Defendant-Appellant*.

---

GERARD E. LYNCH, *Circuit Judge*:

Defendant-Appellant Anthony Christopher Mendonca ("Mendonca") appeals his conviction by a jury in the United States District Court for the Eastern District of New York (Brian M. Cogan, *J.*) on one count of possession of child pornography. On appeal, he presents two separate constitutional challenges, one

centering on the exclusion of the public from large portions of the jury selection process, the other on the admission of inculpatory statements he made to investigators after he was told he had "failed" a polygraph exam – not just as to the possession of child pornography, but also as to the "hands on abuse of kids" – a tactic he argues was so coercive that, in conjunction with other similar behavior, it rendered his subsequent inculpatory statements involuntary.

Although both challenges raise serious concerns, neither was properly preserved below, and we are thus constrained by the exacting standards that govern our review of arguments raised for the first time on appeal. Guided by those standards, we **AFFIRM** the district court's judgment.

## BACKGROUND

### I.     The Government's Investigation of Mendonca

The events that led to Mendonca's arrest began in spring 2018, when federal and New York investigators determined that an online user with a particular IP address had been accessing child pornography using peer-to-peer networks. Investigators were eventually able to link that IP address to Mendonca's home in East Flatbush, Brooklyn, and at 6:00 a.m. on November 20, 2018, they executed a search warrant for that home. One of the Homeland

3

Security Investigations ("HSI") agents who participated in the search would later testify at trial that when he and his team first arrived that morning, they could see Mendonca through a second-floor window, but by the time they entered they found him in the basement.

During their search, agents seized approximately 141 electronic devices, including several computers, external hard drives, and internal hard drives, mainly from a workspace in that basement that only Mendonca used, including "maybe 20 to 30" devices in a desk drawer stuffed "almost completely full" with hard drives. App'x 597-98. Among the internal hard drives in that drawer was one containing over 18,000 images of child pornography. No child pornography was found on any other device. Agents conducting the search, however, did not discover any logbooks or other means of identifying which devices, including the drive with the child pornography, belonged to whom. At the time, both Mendonca and his wife (the only other person living in the home) were employed as information technology ("IT") professionals, and as part of his work, Mendonca would sometimes bring colleagues' devices home to work on them.

While in the Mendoncas' home, HSI agents interviewed Mendonca, and

4

eventually brought him to a nearby New York City Police Department ("NYPD") precinct for a polygraph examination and additional questioning. Those interviews – and the pretrial litigation they inspired – take center stage in this appeal and are discussed in greater detail below. During the precinct interview, Mendonca admitted to downloading and possessing child pornography, and was promptly arrested.

## II. Mendonca's Trial

In November 2018, Mendonca was charged in the Eastern District of New York ("E.D.N.Y.") with a single count of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). The matter was assigned to Judge Cogan, who referred all pretrial matters to Magistrate Judge Sanket J. Bulsara. Trial and surrounding proceedings unfolded over three days in early June 2021, at a time when trials in E.D.N.Y. were subject to stringent pandemic-era protocols. Jury selection took place on June 7, 2021 before Magistrate Judge Cheryl L. Pollak. Those proceedings are also central to this appeal and are discussed in greater detail below.

Judge Cogan presided over the trial proper beginning on June 8, 2021. At trial, the jury was instructed on the following four elements of the charged child

5

pornography offense: (1) "that the defendant knowingly possessed matter containing one or more visual depictions"; (2) a nexus to interstate commerce; (3) "that the production of the visual depiction involved a minor" (and the depiction portrays that minor) "engaging in sexually explicit conduct"; and (4) "that the defendant knew that the production of the visual depiction involved a minor" (and that the depiction portrays that minor) "engaging in sexually explicit conduct." App'x 884. The second and third elements were undisputed.

The trial thus focused primarily on whether Mendonca knew that he was in possession of child pornography. On that point, the government called three HSI agents who were involved in the search of Mendonca's home, the review of the electronic devices seized there, and/or Mendonca's interrogation. It also introduced videotaped excerpts of Mendonca's inculpatory statements during his precinct interview.[1] At closing, the government urged the jury to heed the "overwhelming" forensic evidence, *id.* at 834, which it argued dovetailed with key details from Mendonca's interview statements, including his admission to

---

[1] The rest of the government's case-in-chief consisted of several of the offending images themselves along with the testimony of two other HSI agents concerning the origin of some of the images, including that they were produced outside of New York, and that their subjects were indeed minors.

using a file sharing service called Newshosting to download child pornography on a timetable that aligned with the forensic evidence of activity from the computer in his basement workspace.

Mendonca did not put on a defense. At closing, his counsel argued that "[w]hen the agents showed up at the Mendonca residence, they had already made up their minds" about who was responsible for the child pornography. *Id.* at 839. They then "fed" that predetermined narrative to Mendonca who, "worn out" from "hours of pressuring and questioning," eventually "fed it back to them." *Id.* at 840. Counsel also queried why, even though both Mendonca and his wife worked in IT, and even though Mendonca's workspace was a "tornado" of devices belonging to many people, investigators "never bothered to ask" which devices belonged to whom, or to undertake other forensic work to "find out where those devices came from." *Id.* at 846-48.

The case was submitted to the jury on June 9, 2021. Deliberations lasted less than three hours. During that time, the jury conveyed a single note to the court, requesting to review the admitted excerpts from the recordings of Mendonca's interrogation. It was permitted to do so, and it returned a unanimous guilty verdict shortly thereafter.

In April 2022, Mendonca was sentenced to 30 months' imprisonment, to be followed by a five-year term of supervised release. He is currently serving that sentence and is projected to be released around July 2024. Following the imposition of sentence, Mendonca filed this appeal.

## DISCUSSION

Mendonca appeals two discrete aspects of his conviction: (1) the process by which his jury was selected, and (2) the admission at trial of inculpatory statements that he argues were coerced. We address each challenge in turn.

## I.    Public Trial Right

Mendonca first argues that his Sixth Amendment right to a public trial was violated by Magistrate Judge Pollak's failure, amid a cloud of pandemic-era logistical constraints, to livestream substantial portions of jury selection to the courtroom designated for the public. Although Mendonca's concerns are not without some merit, they were not raised below, and are therefore subject to plain-error review. His arguments on appeal do not satisfy the demanding standard for such review.

### A.    *Mendonca's Jury Selection*

On Thursday, June 3, 2021, Judge Pollak held a telephone conference with

8

the parties to discuss jury selection, which was to begin the following Monday. The impetus for the conference, she explained, was to "run through the selection procedure with you because it is a little bit different than it was before the pandemic." App'x 123. To start, because of social distancing requirements, the court would only be able to screen 35 potential jurors at a time: one batch in the morning and then (at least) another 35 in the afternoon. Second, the process would straddle multiple courtrooms, with the court addressing the "basics" of voir dire with all 35 prospective jurors in the courthouse's larger "ceremonial" courtroom, before, in Judge Pollak's initial vision, breaking into smaller groups who would be shuffled between courtrooms for additional questioning and for-cause dismissals. *Id.* at 125.

Judge Pollak then raised a remaining sticking point that would complicate that initial plan: sensitive questions "that we would normally handle at sidebar," but that could not be so handled in light of the court's stringent social distancing requirements. *Id.* at 129. The parties offered various ideas. The government proposed tracking jurors' threshold responses to those questions as the court proceeded, and then "at the end" reconvening to "bring out each juror individually and do a sidebar on everything so it's much more efficient." *Id.*

Judge Pollak noted with approval that this approach "does avoid having them have to come up to sidebar and hovering with the court reporter there and all the attorneys . . . because obviously we are not permitted to ask jurors if they are vaccinated." *Id.* at 131. Although defense counsel was "fine" with that proposal, he noted his concern that such a lengthy gap between question and response might make jurors less likely to answer honestly. *Id.* at 132. The government offered that another alternative would be "to have them come out individually," but noted that "[i]t seems that would take quite a bit of time." *Id.* Defense counsel agreed: "Yeah, I think if it moves smoothly I think it's a good system and we can always adjust if it's not working." *Id.*

Reflecting on those remarks, Judge Pollak floated the prospect of "winnow[ing] out all of the potentially problematic questions." *Id.* at 133. In other words, she explained, she could confine her initial questioning in the ceremonial courtroom to less fraught subject matters – e.g., "has anyone here served on a jury before, when did you serve," etc. – and then going "one by one" in a smaller courtroom, 2E, for "the more sensitive case specific questions." *Id.* Both parties expressed their approval, and the conversation moved on to other voir dire details.

10

At the end of the conference, Judge Pollak apprised the parties that "you should be aware that there is a room [that] will be set aside . . . for the public and the press. And they will be able to hear *everything that goes on during the jury selection . . . including the questioning in 2E.*" *Id.* at 143 (emphasis added).

That turned out not to be entirely accurate. When the parties reconvened in the ceremonial courtroom on June 7, Judge Pollak briefly recapped, in broad strokes, the jury selection plan, and then called in the first group of prospective jurors. After outlining various COVID protocols and orienting the venire on jury service in general, she laid out the multi-courtroom protocol she intended to employ. That plan largely aligned with what the parties had agreed to a few days earlier: the court would begin with "general questions" of all 35 prospective jurors in the ceremonial courtroom; jurors who had answers requiring follow-up would simply stand up and provide their juror number; the court would then circle back to those issues in the private one-on-one questioning in courtroom 2E.

But Judge Pollak's next instruction was a conspicuous departure from the original plan:

> [D]uring any private questioning the live stream, which
> is being used from this courtroom into a separate room
> for the public to observe the proceedings, *that live stream*

11

> *will be disconnected* during the private questioning and
> the only people who will hear your answers are those in
> the courtroom now; the parties, the lawyers, the judge
> and court personnel, okay? All right.

*Id.* at 164 (emphasis added). The same instruction was given, almost verbatim, during the afternoon session. But although it directly contradicted what Judge Pollak had said previously, no one objected during either session.

Unencumbered by any objection, Judge Pollak forged ahead with her first set of questions in the ceremonial courtroom. These included, among other similar inquiries, whether prospective jurors anticipated having difficulty following basic instructions about the presumption of innocence and jurors' duty to apply the law as instructed, whether any had prior familiarity with the case or the people involved, and whether any jurors had any physical or sensory issues, language issues, or pre-paid travel plans that would pose a hardship should they be selected to the panel.[2] Very few jurors responded in the affirmative; those who did were asked to identify their juror numbers and then to be seated. Judge Pollak next asked, among other similar inquiries, whether any prospective jurors had served on a jury before, had experience (or loved ones with experience) in or

---

[2] In all relevant respects, the afternoon session unfolded much the same as the morning session.

12

around the criminal justice system, or had worked in fields related to computers, software programming, or IT. Here, whenever a juror said yes, Judge Pollak immediately followed up with detailed questioning in front of the rest of the venire. She then closed out that portion of the proceedings by asking if any jurors would have difficulty rendering a verdict based solely on the evidence presented at trial without regard for outside beliefs or ideas, or if any so far felt they would be inclined to favor one side or the other. When two jurors in the morning session stood in response to that last question, Judge Pollak recorded their juror numbers and asked them to return to their seats. At that point, she announced that "we are going to retire one by one to Courtroom 2E" for individual questioning. *Id.* at 201.

Those one-by-one proceedings in courtroom 2E – which, true to Judge Pollak's instruction that morning, were not livestreamed – covered a range of topics, including various claims of hardship (medical appointments, travel plans, employment issues, etc.) and follow-up from earlier unelaborated affirmative responses in the ceremonial courtroom (relatives in law enforcement, prior litigation history, etc.). Jurors were also asked a variety of additional questions, including whether they or their loved ones had ever been subject to criminal

13

investigation or prosecution, accused of child pornography or similar offenses, or connected to child pornography in some other way (via groups that investigate child pornography, provide services to victims, etc.). Several jurors were excused for cause based on their answers during that portion of the proceeding.

Next, Judge Pollak put to each juror who had not yet been excused a suite of basic biographical questions, including (1) their place of residence, (2) duration of residence, (3) whether they rent or own, (4) whether they live with others, (5) marital/parental status and history, and where applicable, details about their spouse and/or children, (6) employment status and details, (7) education history, (8) hobbies, (9) whether they regularly read newspapers or magazines or use the internet, and (10) whether they watch TV and what they like to watch. Finally, after asking each juror whether they felt they could not be fair and impartial, Judge Pollak gave the parties the chance to request additional inquiry.

At no point, morning or afternoon, did any party object to the fact that none of this was being livestreamed.

After all prospective jurors had completed their one-on-one questioning in courtroom 2E, those who remained were directed to return to the ceremonial courtroom for peremptory challenges. Eventually, the final panel was seated, the

14

rest of the venire was dismissed, last-minute instructions were given, and court was adjourned for the evening. The next morning, June 8, 2021, Judge Cogan gave his own preliminary instructions to the final panel, and trial began.

### B. The Public Trial Right

The Sixth Amendment guarantees criminal defendants "the right to a . . . public trial." U.S. Const. amend. VI; *see United States v. Gupta*, 699 F.3d 682, 686 (2d Cir. 2012) ("[W]hile this right derives from both the First and Sixth Amendments, it is the latter that supports a defendant's public trial right . . . ."), citing *Presley v. Georgia*, 558 U.S. 209, 212 (2010). That right "unquestionably extends to *voir dire*," *Gupta*, 699 F.3d at 687, and can abide exceptions "only for good cause shown," *Press-Enterprise Co. v. Superior Ct. of California, Riverside County*, 464 U.S. 501, 505 (1984). Under the Supreme Court's ruling in *Waller v. Georgia*, 467 U.S. 39, 48 (1984), "[t]rial courts must – *before* excluding the public from any stage of a criminal trial – satisfy themselves" of four requirements: (1) the party seeking closure must "advance an overriding interest that is likely to be prejudiced"; (2) the closure "must be no broader than necessary to protect that interest"; (3) the court must consider "reasonable alternatives" to closure; and (4) the court must make "specific findings" sufficient to support the closure. *Gupta*,

15

699 F.3d at 687 (emphasis in *Gupta*) (internal quotation marks and citations omitted). "In other words, if a court intends to exclude the public from a criminal proceeding, it *must* first analyze the *Waller* factors . . . ." *Id.* (emphasis in original).

There are a number of doctrinal carveouts to that rule. For one thing, the standard is somewhat less rigorous for so-called "partial" closures, which require only a "substantial" rather than an "overriding" interest to justify the closure. *United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005).[3] But even for closures deemed partial, the other *Waller* requirements persist: the closure must still be no broader than necessary, and the trial court must justify the partial closure with sufficient findings, having considered reasonable alternatives. *United States v. Laurent*, 33 F.4th 63, 95 (2d Cir. 2022).

Separately, although a violation of the public trial right is a "structural error" and therefore "not subject to harmless-error review," *United States v. Gomez*, 705 F.3d 68, 74 (2d Cir. 2013), we have recognized a narrow "triviality"

---

[3] In determining whether a closure is sufficiently narrow to qualify as partial, we look to factors like "its duration, whether the public can learn what transpired while the trial was closed (e.g. through transcripts), whether the evidence was essential, and whether selected members of the public were barred from the courtroom, or whether all spectators were excluded." *Smith*, 426 F.3d at 571 (internal quotation marks omitted).

exception that, while "very different from a harmless error inquiry," likewise safeguards convictions from vacatur under certain circumstances, *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996); *see Gupta*, 699 F.3d at 688 (emphasizing "the doctrine's narrow application"). In particular, the triviality inquiry looks to "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant – whether otherwise innocent or guilty – of the protections conferred by the Sixth Amendment." *Peterson*, 85 F.3d at 42.[4] Unlike harmless-error review, it "does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer prejudice or specific injury." *Id.* (internal quotation marks omitted).

### C. *Standard of Review*

Although the structural nature of a public trial violation removes it from the ambit of *harmless*-error review, where that violation is not objected to below,

---

[4] To that end, we consider "whether the closure subverts the values the drafters of the Sixth Amendment sought to protect: 1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Smith v. Hollins*, 448 F.3d 533, 540 (2d Cir. 2006) (internal quotation marks omitted). If it does not, we will conclude that the exclusion did not "implicate the Sixth Amendment public trial guarantee." *Id.* (internal quotation marks omitted).

17

we still "review the claim for *plain* error" under Rule 52(b) of the Federal Rules of Criminal Procedure. *Laurent*, 33 F.4th at 95-96 (emphasis added); *see Gomez*, 705 F.3d at 74 ("Whether an error can be found harmless . . . is simply a different question from whether it can be subjected to plain-error review." (internal quotation marks omitted)). Under the standard set forth by the Supreme Court in in *United States v. Olano*, before we may correct an error forfeited by a party's failure to object below, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights"; then, once those initial conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gomez*, 705 F.3d at 75 (internal quotation marks and alterations omitted), citing *Olano*, 507 U.S. 725, 732-36 (1993). It is the defendant's burden to establish all four requirements. *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021); *see Gomez*, 705 F.3d at 75 ("Meeting all four prongs of this test is difficult, as it should be." (internal quotation marks omitted)).

      D.     *Plain-Error Analysis*

That exacting standard of review controls here.

With respect to the first element, the district court demonstrably erred

when it decided not to livestream large portions of the jury selection process to the separate courtroom reserved for the public. That is true regardless of the extent of the closure. Partial or not – and we do not have occasion to decide whether it is appropriate to characterize as partial the decision to shut all members of the public out from essentially all of the individualized voir dire, sensitive and non-sensitive questions alike – our precedents make clear that the extent of the closure affects only the requisite *degree* of the interest advanced under the first *Waller* factor. It does not eliminate that factor altogether, nor any of the other *Waller* obligations; it does not excuse the court from ensuring that the closure is no broader than necessary, from considering alternatives, from making specific findings that justify the closure, *Laurent*, 33 F.4th at 95, nor from doing all of those things "*before* excluding the public from any stage of a criminal trial," *Gupta*, 699 F.3d at 687 (emphasis in original) (internal quotation marks omitted). None of that happened here, and the government does not attempt to argue otherwise.[5] And that was surely error. *See Gupta*, 699 F.3d at 678-

---

[5] Instead, the government offers several responses that rather miss the point. First, it argues that the closure was justified by a substantial reason, which, true or not, is immaterial where the court made no such finding on the record, to say nothing of meeting *Waller*'s other demands. Next, the government insists that "[t]he magistrate judge's individual questioning of the prospective jurors in

88 (holding that "despite not making any *Waller* findings, the district court intentionally excluded the public from the courtroom for the entirety of voir dire" and therefore, "[o]n these facts alone, the closure was unjustified"); *see also*

---

courtroom 2E was the functional equivalent of a sidebar conference," and therefore either not a closure at all, or too trivial to "subvert any of the values derived from *Waller*." Appellee's Br. 43, 51 (internal quotation marks omitted) Both of those arguments fail for the same reason: the proceedings in courtroom 2E went well beyond what could be reasonably characterized as typical of a sidebar. The court conducted essentially all of its individualized voir dire in courtroom 2E outside the view of the public. Once the livestream was discontinued, the court did not confine itself to follow-up on potentially sensitive matters broached in the ceremonial courtroom, nor even to sensitive questions reasonably likely to invite a sidebar if answered in the affirmative (much less to situations where there had actually been an affirmative answer to one of those threshold questions). We are aware of no authority supporting the notion that standard and unremarkable voir dire questions like "[w]here do you live," "[t]ell me about your education," and "[d]o you watch TV at all," *e.g.*, App'x 215-17, are typically shielded from public view absent an "affirmative request" for privacy because the question touches on "deeply personal matters that [a juror] has legitimate reasons for keeping out of the public domain." *Press-Enterprise*, 464 U.S. at 511. Finally, the government compares the closure in this case to one we deemed covered by our triviality carveout in *Gibbons v. Savage*, 555 F.3d 112, 121 (2d Cir. 2009). But in that case, "nothing of significance happened" during the closure: "The judge read the indictment, asked questions of a few jurors, and provided administrative details on what the jurors should expect if chosen." *Id.*; *see also United States v. Shipp*, No. 21-1284-CR, 2022 WL 16543193, at *1 (2d Cir. Oct. 31, 2022) (summary order). The same can hardly be said of a closure that encompassed not just sensitive responses normally heard at sidebar, but the lion's share of the jury selection process and nearly all of the individualized voir dire, for-cause dismissals, and sensitive questioning – including most of the innocuous threshold questioning that might prompt a sensitive sidebar.

*Presley*, 558 U.S. at 214 ("[T]rial courts are required to consider alternatives to closure even when they are not offered by the parties.").

Turning to the second *Olano* requirement, we conclude that the error was "plain," for many of the same reasons. 507 U.S. at 734. *Waller* and *Press-Enterprise* are long-standing precedents, and the government does not dispute that there is a substantial body of circuit case law addressing their application to jury selection as a significant part of a criminal trial right to which the public trial right attaches. *See, e.g., Gupta*, 699 F.3d at 687.

But whatever the phrase "plain error" might otherwise suggest, the existence of (1) "error" that is (2) "plain" is only half the battle. *See United States v. Lewis*, 424 F.3d 239, 246-47 (2d Cir. 2005). There are still two more steps: "[E]ven though the error be plain, it must also [3] affect substantial rights," and even then we must still determine (4) "whether the forfeited error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (internal quotation marks and alterations omitted), citing *Olano*, 507 U.S. at 732-37.

Turning briefly to the "substantial rights" requirement, although that third *Olano* step ordinarily tests whether the error "affected the outcome of the district

21

court proceedings," *United States v. Ragonese*, 47 F.4th 106, 110 (2d Cir. 2022)

(internal quotation marks omitted), the Supreme Court has repeatedly

"reserv[ed] the question whether 'structural errors' automatically satisfy the

third 'plain error' criterion,"[6] *United States v. Marcus*, 560 U.S. 258, 263 (2010)

---

[6] There is some reason to think not. To start, plain error is "simply a different question" from harmless error, *Gomez*, 705 F.3d 74, and protects different interests. "[T]he harmless-error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991) (internal quotation marks omitted). In contrast, plain-error review "encourage[s] timely objections and reduce[s] wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). It is therefore not farfetched to imagine that structural error would play different roles in each setting. In the context of harmless error, moreover, the "structural" umbrella really covers two different categories of error: (1) those so "obviously" problematic that it is all-but impossible for them *not* to have prejudiced the defendant, such as the total deprivation of the right to counsel throughout trial, *Fulminante*, 499 U.S. at 309, or the "denial of an impartial judge," *United States v. Sedillo*, 10 F. App'x 690, 691 (10th Cir. 2001) (unpublished disposition), citing *Liteky v. United States*, 510 U.S. 540, 555 (1994) (the "high degree of favoritism or antagonism" required to amount to such an error "make[s] fair judgment impossible"); and (2) those errors – like a public trial right violation – whose effects are "often difficult" for appellate courts to measure, and that are unlikely to be outcome-determinative in deciding guilt or innocence, but that nonetheless ordinarily warrant reversal because they destabilize the very "framework within which the trial proceeds," *United States v. Marcus*, 560 U.S. 258, 263 (2010) (internal quotation marks and alteration omitted). But in the context of plain error, where even the defendant does not believe, in the moment, that an error is worth objecting to, it is

(collecting cases); *see United States v. Eldridge*, 2 F.4th 27, 38 (2d Cir. 2021) (acknowledging that the Supreme Court has "noted the possibility that certain errors, termed structural errors, might affect substantial rights regardless of their actual impact on an appellant's trial," but declining to reach the issue), *rev'd on other grounds*, *Eldridge v. United States*, 142 S. Ct. 2863 (2022), quoting *Marcus*, 560 U.S. at 263.

We need not wade into those waters, however. Even assuming the third requirement was met here, Mendonca's challenge founders on the fourth and final plain-error prong. *See Johnson*, 520 U.S. at 469 (rejecting a plain-error challenge where "even assuming that the [error] affected substantial rights, it does not meet the final [plain-error] requirement" (internal quotation marks and alterations omitted)); *see also United States v. Hougen*, 76 F.4th 805, 813 (9th Cir.

---

reasonable to wonder whether our inability to retrospectively measure any prejudice should matter. Put bluntly: if the defendant did not fear any prejudice, why should we? *See United States v. Nelson*, 277 F.3d 164, 206 (2d Cir. 2002) ("[W]e do not imply that all claims of structural error (of error that requires automatic reversal rather than harmless error review) are unwaivable."), citing *Freytag v. Comm'r*, 501 U.S. 868, 896 (1991) (Scalia, *J.*, concurring in the judgment) ("Must a judgment already rendered be set aside because of an alleged structural error to which the losing party did not properly object? There is no reason in principle why that should always be so."). There may well be a compelling answer to that question, but like a long line of courts before us, we need not search for it today.

23

2023) (rejecting, on the fourth plain-error prong, a pandemic-era public trial right challenge, rebuffing the defendant's argument that the court was "preclude[d]" from conducting "an individualized fourth prong analysis in cases implicating a structural error").

Courts have yet to define with much particularity what precisely it means to "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 469 (internal quotation marks omitted). That is not entirely by accident; the Supreme Court has explained that "[t]he fourth prong is meant to be applied on a case-specific and fact-intensive basis."[7] *Puckett v. United States*, 556 U.S. 129, 142 (2009); *see Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (rejecting another Circuit's formulation of the fourth prong as "unduly restrictive"); *United States v. Young*, 470 U.S. 1, 16, (1985) ("[W]hen addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record . . . [because] each case necessarily turns on its own facts." (internal quotation marks and citations

---

[7] Separately, we have also observed – and this is almost as true today as it was in 1997 – that "[t]his requirement is not discussed in many of our prior cases, because a court need not reach the issue unless *Olano*'s first three conditions are satisfied." *United States v. Knoll*, 116 F.3d 994, 1001 (2d Cir. 1997) (internal citation omitted).

omitted)). It has also underscored that even in circumstances where "the integrity of the system may be called into question," there may be key "countervailing factors in particular cases" that nonetheless excuse the unpreserved error. *Puckett*, 556 U.S. at 142-43.

That guidance resonates here. In this case, there are indeed conspicuous countervailing circumstances. First, this trial was held relatively early in the pandemic,[8] when the legal community in New York was still sorting out how to accomplish justice under the many new constraints imposed to keep jurors, litigants, and court staff safe. While a defendant's rights of course do not disappear during a pandemic, that context is vital to our understanding of the fourth plain-error prong. This challenge would not be before us had the district court not been compelled to juggle multiple courtrooms, multiple lines of questioning, and multiple batches of jurors as it labored to satisfy tried-and-true voir dire norms in circumstances that were anything but normal. Tellingly, we have excused other public trial violations under the fourth prong where the error similarly arose from the district court's understandable – though flawed –

---

[8] Judge Cogan confided to the parties at the end of trial that this was in fact his very "first trial back since the pandemic." App'x 893. Judge Pollak had presided over at least one prior pandemic-era jury selection.

25

response to logistical constraints and other environmental concerns. *See, e.g.*, *Gomez*, 705 F.3d at 75-76 (excluding defendant's family members during voir dire "cannot be viewed as [an error] that affected the fairness, integrity, or public reputation of judicial proceedings" where it was "clear from [the] inquiry by the district judge, when the prospective jurors were about to be brought to the courtroom, that the judge anticipated having at least some of the persons already seated leave because, as the record reveals, there were not enough seats for all of the venirepersons"); *United States v. Killingbeck*, 616 F. App'x 14, 16 (2d Cir. 2015) (summary order) (claimed Sixth Amendment error of "restricting the display of trial exhibits [containing child pornography] to the courtroom audience," in addition to not being plain, "did not seriously affect the fairness, integrity, or public reputation of the trial").

Second, we give considerable weight to Judge Pollak's deliberate efforts to foster a collaborative environment for the court and the parties to figure out how best to complete a fair voir dire under challenging and unusual circumstances. While, for purposes of the first plain-error prong, she fell short of her duty under *Waller* to explore alternatives to closure on the record, she was open to, and indeed eagerly solicited and incorporated, input from the parties about how best

to conduct voir dire. The transcript of the pretrial conference demonstrates that Judge Pollak was guided by a genuine aim to collaboratively navigate difficult and novel circumstances towards a just solution – including by ensuring that the parties were empowered to (and often did) provide feedback at every turn. As the Supreme Court has noted, "the public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *Rosales-Mireles*, 138 S. Ct. at 1908 (internal quotation marks omitted). Judge Pollak's clear effort to satisfy that aspiration does much to rebut any claim that her actions brought the legal system into "disrepute."

Granted, the final procedure differed from what the parties had agreed to, and from what Judge Pollak had previewed, days earlier. That was undoubtedly error. But whether that departure resulted from a changed mind or was purely inadvertent, Mendonca had every opportunity to object – *opportunities*, in fact, since the court employed the same procedures in the morning and in the afternoon, after a lunch break – and elected not to. Had he done so, "the trial court might well have adopted an alternative" or, at the very least, "been alerted to announce the findings . . . as to the necessity for, the needed breadth of, and

27

the possible alternatives to, any exclusion." *Gomez*, 705 F.3d at 75-76. Or, likely

enough, Judge Pollak would have realized that she had already announced a

different plan to the parties, and simply corrected the mistake. *See Puckett*, 556

U.S. at 134 ("[T]he timely raising of claims and objections . . . gives the district

court the opportunity to consider and resolve them."). Neither party has

disputed that other trials in E.D.N.Y. around this time proceeded without raising

public trial concerns. *See, e.g.*, *United States v. Shipp*, No. 21-1284-CR, 2022 WL

16543193, at *1 (2d Cir. Oct. 31, 2022) (summary order). That fact, along with the

judge's earlier assumption that the livestream would be operational throughout

voir dire, suggest that there was no technological or logistical barrier to

livestreaming any portion of voir dire the court wished to livestream.[9] All that

was missing was an objection.

We have remarked in the past that reversal "serves little purpose when the

defendant makes no more than a perfunctory effort to prevent the closure," let

alone no effort at all, and that "to the extent that a public trial serves the broader

public interest in fair trials designed to end in just judgments, that purpose is best

---

[9] Nor indeed did Judge Pollak ever imply that the reason she was deviating from her earlier plan was because of any such constraint. She gave no explanation at all – in no small part because no objection ever occasioned one.

served by requiring a defendant to press his argument in a forceful and persuasive way rather than by awarding a windfall" to one who chooses not to do so. *Brown v. Kuhlmann*, 142 F.3d 529, 542 (2d Cir. 1998) (internal quotation marks, citations, and alterations omitted); *see Gomez*, 705 F.3d at 74 ("Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal." (emphasis omitted)), quoting *Levine v. United States*, 362 U.S. 610, 619-20 (1960).[10] That perspective does not require us to affirm every time any defendant has failed to object to any error, but we find it instructive under the present circumstances.

For all of those reasons, we think "no miscarriage of justice will result here if we do not notice the error," *Johnson*, 520 U.S. at 470 (internal quotation marks omitted), and we therefore decline to vacate Mendonca's conviction on that basis.

---

[10] In the absence of a contemporaneous objection, moreover, we have no record as to whether any member of the public ever was present or attempted to enter the room reserved for the public at any time while the livestream was cut off, or for that matter while it was on.

## II.     Voluntariness of Mendonca's Statements

Mendonca's second challenge to his conviction attacks the voluntariness of the inculpatory statements he made during his police interrogation that were introduced against him at trial. Once again, however, Mendonca failed to preserve the issue below, and thus while we are troubled by some of the police tactics employed in this case, we discern no plain error in the district court's decision to admit those statements.

### A.     Mendonca's Interrogation

The following account of Mendonca's interrogation is undisputed. It is drawn from the transcript and video recordings of the interrogation; as explained below, there was no evidentiary hearing regarding Mendonca's motion to suppress the statements.

Mendonca was first questioned by HSI Special Agents Krista Cousins and Luanne Walter while his home was being searched. In the course of that initial 80-minute home interview, which was recorded, Mendonca was advised of, and agreed to waive, his *Miranda* rights. Afterwards, he voluntarily accompanied police to the nearby 63rd NYPD Precinct, where he was questioned for the better part of four hours. Throughout that precinct interview, which was also recorded,

he was periodically offered water, bathroom breaks, and other accommodations.

The precinct interview began around 8:50 a.m. with questioning by NYPD Detective Anthony Santilli. After some preliminary discussion, re-reading (and re-waiving) of Mendonca's *Miranda* rights, and small talk, Santilli broached the prospect of Mendonca taking a polygraph exam. He assured Mendonca that the exam was "100% voluntary" and that Mendonca was free to stop, and leave, at any time; he was not under arrest. App'x 1083-84. "Right now," he continued, "you're the only person that knows whether or not [] you did this," but "[i]f you take this test in about two hours we'll both know." *Id.* at 1085. He advised Mendonca that "[i]f you did do this, you should refuse the test," but "[i]f you didn't do it, it's an easy way for me to eliminate you as a suspect." *Id.* Mendonca agreed to take the polygraph exam and signed a consent form to that effect.

After further questioning on an eclectic mix of subjects – from Mendonca's background and education, to whether his wife could have been responsible for downloading the child pornography at their home,[11] to whether Mendonca

---

[11] Santilli would revisit this subject later in the interview, countering Mendonca's continued resistance to the child pornography allegations by asking, "It's your wife's then? So . . . we'll arrest your wife once we got that. . . . Are you kidding me? . . . Like, you're gonna blame your wife." App'x 1151-52. Mendonca retorted that he was blaming neither his wife nor himself: "It's not our pornography." *Id.*

"ha[d] ever watched that TV show Mindhunters," *id.* at 1119-20 – Santilli began priming Mendonca for the exam. He regaled Mendonca with an extended overview of the polygraph technology and underlying science before eventually connecting Mendonca to "the instruments," explaining that "[b]asically the pad you're sitting on . . . detects motion from your waist down" and two other devices attached to his chest "detect motion from your waist up." *Id.* at 1110. Fingertip sensors would detect sweating, blood pressure, and heart rate, "like [in] a doctor's office." *Id.* at 1112. In other ways, the exam might recall a "school test" – though, unlike in school, where a score of "97" might earn top marks, here "you need 100 to pass." *Id.* at 1123.

Finally, before proceeding with the exam, Santilli conducted some preliminary diagnostics. He asked Mendonca to circle numbers on a piece of paper, close his eyes, be still, and answer yes or no questions about the numbers he had circled. Based on that process, Santilli immediately announced that he had determined that the exam would be effective on Mendonca.

The exam itself involved, in Santilli's characterization, three different categories of questions: (1) "control" questions; (2) "incident" questions, targeting

at 1152.

32

whether Mendonca did the specific thing he was accused of; and (3) "profile character" questions, which, according to Santilli, "if you pass, you know, I can competently say that, listen, not only did he not do it [but] he's not even the type of person that would have done it." *Id.* at 1115. The actual exam questions included, among others, the following:

- Is today Sunday?
- Do you intend to . . . answer every test question truthfully?
- During the first 42 years of your life have you ever been attracted to someone too young for you?
- As an adult have you ever had sexual contact with a minor in any way?
- In your entire life can you remember ever doing anything to a female you[r] age without her permission?
- During the first 42 years of your life did you ever lie to avoid responsibility for something you did?
- Did you ever knowingly possess child pornography?
- Have you done anything to try and deliberately beat this test?

*Id.* at 1129-31. Mendonca completed the exam multiple times, denying all wrongdoing. At one point, Santilli accused Mendonca of "moving around, . . . you're doing something with your body. . . . You're trying to play games. I can see it . . . ." *Id.* at 1132. After the third run-through of the questions, Santilli left

33

the room for about ten minutes to "go grade this and give you some feedback." *Id.* at 1142.

Immediately upon his return, he announced, "O.K. There is no doubt that you're lying." *Id.* at 1143. And "you didn't just fail the child pornography test question. You failed, uh, hands on abuse of kids. Having sexual contact with a minor." *Id.* Much of the ensuing questioning played on that theme. To start, Santilli offered that he did not believe the agents "really care about the child pornography" at all, but rather had targeted Mendonca because he fit the second, and more problematic, of two common child pornography archetypes: (1) cases where "we just knock on the door and say, hey listen, man, uh, you've been downloading some stuff you really shouldn't be downloading" and "[w]e'll try to get you therapy," as opposed to (2) cases where the suspect is believed to pose an ongoing, direct risk to children. *Id.* at 1144-45. Mendonca, Santilli confided, fell into the second bucket because he worked in IT at a school building that housed both elementary and middle school students. And that left Santilli concerned: "[Are] you the type of person to take a brand new kid off the street, rape them and murder them and throw their body in your back yard? Are you?" *Id.* at 1147. Those worries, Santilli claimed, flowed from his own experiences on the force.

34

"I've had cases where the individual literally had taken a kid off the street . . . and basically put his hands down her pants and then ran off." *Id.* at 1150-51. Mendonca repeatedly denied abusing children.

That hardly satisfied Santilli. "[I]f I'm asking you if you ever had sexual contact with a kid how am I supposed to believe that when you're lying about" possessing child pornography. *Id.* at 1146. Bemoaning that Mendonca was "[l]ying to my face" even after he had "bombed" the polygraph exam – "[D]on't play me like I'm a fucking idiot. . . when you keep lying to me, you disrespect me," *id.* at 1147-48, 1154 – Santilli urged that he was "looking for your cooperation to make sure . . . that there's no children that you've . . . raped or murdered." *Id.* at 1154-55.

Moreover, he cautioned, that cooperation would affect his recommendation to prosecutors. "[S]hould my recommendation to the district attorney be that he's an asshole who probably raped and murdered a bunch of kids?" *Id.* at 1155. Or should his recommendation be that Mendonca was still at an early stage where "i[f] we intervene and make sure that they get help at this stage before it progresses to the point where they pull a kid off the street . . . [o]r while you have some one-on-one time with a kid in a classroom[?]" *Id.* He

35

repeatedly threatened that Mendonca's lack of candor as to the child pornography accusations would trigger larger concerns for police and prosecutor alike, which could in turn affect Mendonca's punishment for possessing child pornography: "[I]f you're not being honest about [child pornography], then I'm automatically jumping [to the conclusion] that something happened with the kids at school. And then . . . when I talk to the district attorney, my recommendation isn't going to be, hey, this is a guy that has a problem[,] that can't control it, that doesn't know how to get the help, maybe he should be put in some sort of therapy instead of, you know, criminal charges or jail time." *Id.* at 1156. Mendonca continued to deny all wrongdoing, and eventually a frustrated Santilli stepped out of the room shortly before 11 a.m.

About 15 minutes later, HSI Agent Cousins entered and took the lead on a variety of topics. These initially included Mendonca's home, his electronic devices, his personal and professional life, his religion, and his practice of downloading feature films and adult pornography online. When the conversation turned to adult pornography tastes, Santilli, who had been observing quietly, chimed in with his own pornography preferences, prodding Mendonca to disclose whether he was "into like people peeing on each other"

36

and whether he knew what "Lolita" means. *Id.* at 1187-89.

Temperatures soon began to rise again. Both Santilli and Cousins continued to press Mendonca for some time, insisting that they knew he was lying, that they knew that he knew that he had child pornography, and either that they wanted to help him avoid getting to the point where he would actually hurt children, or, alternatively, that they suspected he already had. Santilli reiterated that "[s]omeone who is found with a terabyte of child pornography on their hard drive is probably someone that has a problem with touching kids." *Id.* at 1193. "[I]f we can't feel confident that you've realized you have a problem with it, how can I comfortably let you out into the world?" *Id.* Accordingly, once again, while he might prefer to recommend "court mandated therapy" for Mendonca, "I can't give that recommendation to the district attorney, if you're not being a hundred percent honest with us." *Id.* at 1194.

By this point, Mendonca was beginning to waver. "I don't think I'm . . . sexually attracted to kids," he pondered, but "[h]ow do I determine if that's part of who I am, that I don't know about. Is that something in me?" *Id.* at 1199. Soon thereafter, he offered that although he "d[id]n't think" he needed such help, he was "willing . . . to open up to a counselor . . . and see if there's something that

37

I'm hiding [from] myself." *Id.* at 1206. Cousins responded that "this is your chance to talk about you, and talk about why, and talk about . . . if you're sorry." *Id.* at 1207. "If you don't want to do this anymore, this is your chance to say that because you get one chance with us, right?" *Id.* Moments later, she repeated that "[w]e're doing this for you because this is your only chance to talk." *Id.* at 1208.

At last, Mendonca began to confess, albeit in fits and bursts. He first admitted to "downloading a lot of videos and put[ting] them on the hard drive. But . . . I don't think they were kids of some sort." *Id.* Moments later, though, he acknowledged that he had downloaded "maybe 10, 20" videos containing child pornography, "and pictures too." *Id.* at 1211. He described those files as depicting "a young person, like a young girl, a young man, or . . . images of like a child on a beach or . . . running around in a house, or something like that." *Id.* He speculated that the children depicted were "maybe 6 to 10 years old," and that they were mostly young girls – answering "[y]eah" when asked whether "females" were his preference – but "you'd probably find like a boy or two in there somewhere." *Id.* at 1211-12. He explained that he had downloaded the files using a program called Newshosting, discussing at length the mechanics of that process and (without being prompted) providing his username and password.

38

Cousins and Santilli then circled back to the prospect of Mendonca "hurt[ing] a child." *Id.* at 1237. First, Cousins asked whether Mendonca viewed these videos "[b]ecause you're a terrible person and you want to see those children hurt or do you view these videos because you can't help but be sexually attracted, because you do masturbate because it's something that you can't help." *Id.* at 1238. "It's one or the other," she would later reiterate. *Id.* at 1248. When Mendonca denied masturbating to the videos, she quipped, "So you just want to see children hurt." *Id.* at 1238. Mendonca denied both that he was sexually attracted to the children and that he enjoyed watching children get hurt. Around the same time, asked whether he thought that those who create child pornography feel ashamed, Mendonca answered, "I mean I would feel ashamed," which prompted Santilli to ask, "What happened? Where did it happen?" *Id.* at 1242. Mendonca responded, "What? The downloading?" *Id.* Santilli clarified, "With the kids. Taking the videos. Taking a picture." *Id.* When Mendonca denied that he had personally created child pornography, Santilli remarked, "The way you're talking it sounds like you did." *Id.* at 1243.

As the clock ticked closer to 1 p.m., Cousins reminded Mendonca that "this is your time" to say anything else "to help yourself." *Id.* at 1244-45. After locking

down one more unambiguous confession – Mendonca's admission that he had been downloading child pornography for "[m]aybe about two years or so," *id.* at 1246 – the interviewers asked Mendonca if he would be willing to write and sign a statement in his own words. That statement would in turn be sent to prosecutors, who would then decide how to proceed "based on our recommendation, based on your statement, based on the facts." *Id.* at 1250. Mendonca consented, and produced a handwritten statement in which he admitted to "us[ing] a site call[ed] Newshosting, to download[] Games, movies, books, vidos [sic]" and to "download some videos to an external hard Drive and keep it." *Id.* at 933. The statement continued: "I very sorry [sic]. . . . I need help to on this [sic], and what to do. I Never take pic [sic] or videos [of] kids in any way, and will never do that. Thank [sic] for understanding." *Id.*

### B. *Mendonca's Pretrial Motions*

Nearly two years before trial, in September 2019, Mendonca moved to suppress all the inculpatory statements from the precinct interrogation, arguing that under the totality of the circumstances, both his *Miranda* waivers and subsequent statements had been coerced. He based that motion on three specific pre-polygraph exam tactics: (1) Santilli's misrepresentation that Mendonca

40

"could prove his innocence by taking the exam," which was "a promise [Santilli] knew could not be fulfilled"; (2) Santilli's explanation that if Mendonca was indeed innocent, it would be in his interest to take the polygraph exam, which Mendonca characterized as "impermissibl[e] . . . legal advice"; and (3) Santilli's suggestion that if Mendonca "chose not to speak," police "would assume his guilt," which Mendonca argued invalidated his prior *Miranda* waiver. Dkt. No. 26 at 3-5. The motion did not address the post-exam conduct that has become central to this appeal.

The motion was referred to Magistrate Judge Bulsara, who held oral argument in December 2019.[12] Opting to rely on the recording and transcript of the interrogation, Judge Bulsara did not hold an evidentiary hearing and did not otherwise invite testimony from Santilli, Cousins, or others. Consequently, there is no sworn testimony regarding, among other things, Santilli's experience and training in administering polygraph tests or interpreting their results, whether Santilli's characterizations of the polygraph results to Mendonca accurately

---

[12] Although at the time of oral argument, Judge Bulsara had apparently not yet had the opportunity to review the full interview recording or transcript, the parties eventually provided the court with a recording and transcript of the entire interview before the report and recommendation issued.

reflected his subjective opinion as an expert polygraph examiner, or for that

matter whether Mendonca had actually been connected to a properly functioning

polygraph. Nor does the record contain any raw polygraph data.[13]

In February 2020, Judge Bulsara issued a report and recommendation

("R&R") concluding that both Mendonca's *Miranda* waivers and subsequent

statements were voluntary and recommending that the suppression motion be

denied. Although the R&R contained a conspicuous warning that, pursuant to

Rule 59(b)(2) of the Federal Rules of Criminal Procedure, objections must be filed

within 14 days, Mendonca never objected. A few weeks later, Judge Cogan

adopted Judge Bulsara's recommendations in a brief text order:

> Defendant has filed no objections to [the] Report and
> Recommendation. I agree with Magistrate Judge
> Bulsara's well-reasoned decision that defendant's
> statements were made voluntarily and without

---

[13] The parties made a few vague representations at oral argument as to their understanding of what polygraph records exist, and to what extent they were provided to the defense before trial. Mendonca also represented in one of his submissions to the district court that the government had provided some raw polygraph data to the defense during discovery. But none of that is in the record, and regardless, these representations do little to advance our understanding of the basic question left hanging by the record: whether the statement that (at least in Santilli's opinion) Mendonca failed a polygraph exam not just with respect to child pornography, but also with respect to the "hands on abuse of kids," was a fabrication.

> coercion. Therefore, defendant's [] motion to suppress is denied.

Dkt. Entry dated Feb. 19, 2020.

Over a year later, as trial approached, the government moved in limine to introduce portions of the videotaped precinct interrogation. Mendonca countered that if any inculpatory statements were admitted, the court should play the entire recording (subject to some redactions) "in the interest of context and completeness." Dkt. No. 56 at 3. "[I]n addition to several hours of coaxing Mr. Mendonca into making statements," he urged, "the interrogation in this case involved an especially atypical and coercive feature: an NYPD detective administered a polygraph examination to Mr. Mendonca, and then told Mr. Mendonca he had failed the polygraph as a means of continuing the interrogation." *Id.* Judge Cogan primarily sided with the government but permitted Mendonca to introduce a few excerpts to show "the nature of the agents' questioning and the environment of the interrogation." Dkt. No. 75 at 2.

In the end, scenes from the precinct that were played for the jury included: (1) a five-minute clip beginning at timestamp 8:48 a.m. that shows Santilli bringing Mendonca water, reading him his *Miranda* rights, and asking some

preliminary questions, GX 206-E; (2) a one-minute excerpt at 10:44 a.m. that shows Santilli warning Mendonca "don't play me like I'm a fucking idiot," GX 206-K; (3) a nine-second clip at 10:52 a.m. that shows Santilli telling Mendonca that his concern was to ensure "that there's no children that you've raped or murdered," GX 206-L; (4) a 16-minute clip beginning at 10:56 a.m. that shows Santilli storming angrily out of the room, leaving Mendonca alone for nearly 15 minutes, and then Cousins entering with Santilli to begin the next stage of the interview, GX 206-G; (5) a 16-second clip at 11:29 a.m. that shows Mendonca confirming that his wife does not use his external hard drives, GX 206-H; (6) a 26-minute excerpt beginning at 12:06 p.m., containing the first wave of confessions and the detailed discussion of Newshosting, GX 206-I; and (7) the final 25 minutes of the interview, beginning at 12:47 p.m., containing more incriminating statements as well as the period when Mendonca was left alone to write out his statement. GX 206-J. The jury was also shown the handwritten statement itself. Most of the interactions at the heart of this appeal were not shown to the jury.

### C.     *Voluntariness Standards*

Challenges to the voluntariness of a confession are based on two

44

overlapping constitutional provisions: (1) due process protections under the Fifth

(or Fourteenth) Amendment, and (2) the Fifth Amendment privilege against

self-incrimination. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). We need not

disaggregate the two: "As a general matter, courts' descriptions of statements as

'compelled' (invoking the text of the Self-Incrimination Clause) and/or

'involuntary' (invoking, arguably, the Due Process Clause) are often used

interchangeably and the words often treated synonymously." *United States v.

Allen*, 864 F.3d 63, 82-83 n.84 (2d Cir. 2017).[14] And "[a]lthough this principle and

---

[14] The privilege against self-incrimination also creates the affirmative right to be warned of one's "*Miranda* rights." Although Mendonca has at times invoked *Miranda* (and although the two strains of Fifth Amendment authority have intermingled over the years), this appeal is a classic voluntariness challenge. Mendonca does not argue, for example, that the *Miranda* warnings he received were deficient; despite the government's fixation on that question, Mendonca has disavowed any *Miranda* argument on appeal. *See* Oral Argument 7:43-8:11. In any event, "[t]he existence of a knowing and voluntary [*Miranda*] waiver does not . . . guarantee that all subsequent statements were voluntarily made," and we therefore "cannot 'dispense with the voluntariness inquiry' simply because we determine that a defendant's waiver was valid." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 211-12 (2d Cir. 2008), quoting *Dickerson*, 530 U.S. at 444. A letter-perfect recitation of the classic *Miranda* warnings and a freely given waiver of the right not to respond to questions would not render a subsequent confession voluntary if, for example, in between the waiver and the confession, officers tortured the subject. The same principle applies to other forms of coercion. *See, e.g.*, *United States v. Anderson*, 929 F.2d 96, 98-102 (2d Cir. 1991) (although it was "quite clear" that *Miranda* warnings had been "adequate," agent's "coercive" suggestion "that if [the suspect] asked for a lawyer it would

45

its elaboration have been deemed to be due variously to the Due Process clause and the Fifth Amendment right against self-incrimination, the modern test for voluntariness is well established and multi-faceted." *United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) (internal citations omitted).

The test is indeed multi-faceted. There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). Broadly, we have recognized that "voluntary" means "the product of a free and deliberate choice rather than intimidation, coercion, or deception," *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (internal quotation marks omitted), and thus that a confession is not given voluntarily when "obtained under circumstances that overbear the defendant's will at the time it is given," *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

In practice, "[w]e look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). Those

---

permanently preclude him from cooperating with the police" nonetheless rendered involuntary confessions "made immediately after the warnings were given").

circumstances generally fall into three categories: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018), quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary . . . ."). Mendonca's challenge focuses almost entirely on the third category, which the Supreme Court has positioned as both a necessary and (potentially) sufficient condition to a finding of involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause . . . ."); *Haynes v. Washington*, 373 U.S. 503, 504 n.1, 513-15 (1963) (holding that a confession was involuntary based on police conduct, even though the defendant made "no claim that he was physically abused, deprived of food or rest, or subjected to uninterrupted questioning for prolonged periods").

Ultimately, the government bears the burden to establish "by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice" and thus admissible at trial. *Anderson*, 929 F.2d at 99; *see Taylor*, 745 F.3d at 23.

47

*D.* *Standard of Review*

Ordinarily, "[w]e review the factual findings underpinning the district court's voluntariness determination for clear error while subjecting the ultimate conclusion that a defendant's statements were voluntarily [made] to *de novo* review." *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012). In this case, however, the parties dispute the proper standard of review based on (1) Mendonca's failure to raise issues key to his voluntariness challenge on appeal in his suppression motion below, coupled with (2) his failure to object to Judge Bulsara's R&R. We agree with the government that the particular challenge Mendonca advances on appeal is doubly encumbered by these dual procedural failures.

We begin with Mendonca's shifting rationales. On appeal, Mendonca argues in substantial part that his interrogators coerced his confession by misleadingly declaring, *after* he had taken his polygraph exam, that his test results suggested he had "committed 'hands on abuse' of kids and 'sexual contact with a minor,'" and then "quickly extrapolat[ing] this to evidence that Mendonca had physically abused children at the school where he worked" – in other words, by cowing him with the kind of "false evidence" that has been "implicated in the

vast majority of documented police-induced false confessions." Appellant's Br. 53-54 (internal quotation marks omitted). He also argues that *after* his polygraph exam, and based on his purported results, his interrogators improperly threatened that if he "did not confess to possessing child pornography, the detective would have to tell 'the district attorney' that Mendonca was 'an asshole who probably raped and murdered a bunch of kids.'" *Id.* at 57, quoting App'x 1155. Similarly, he argues that *after* his polygraph exam, he was hoodwinked into believing that this interrogation was "his only chance" not just "to admit that he viewed child pornography" but also "to avoid accusations" of the even more serious crimes purportedly flagged by the polygraph results. *Id.* at 55-57 (internal quotation marks omitted).

None of that was argued below. Mendonca's suppression motion exclusively addressed the *pre*-exam tactics Santilli used to coax Mendonca into taking the test in the first place.[15] "It is a well-established general rule that an

---

[15] Mendonca did eventually set his sights on post-exam conduct before the district court, but only in his response to the government's bid to introduce his confessions at trial. Even in that context, though, he did not argue that the cited conduct rendered his statements involuntary as a matter of law and thus excludable; rather, he simply urged that if the jury was to see the confessions, it should in fairness see "the complete picture" – including the details of Santilli and Cousins's post-exam conduct – so that jurors could themselves "assess the

49

appellate court will not consider an issue raised for the first time on appeal."

*United States v. Gershman*, 31 F.4th 80, 95 (2d Cir. 2022) (internal quotation marks and alteration omitted); *see Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (declining to entertain new arguments raised on appeal where the party had raised different arguments in support of the same general legal claim below). "This rule is not an absolute bar to raising new issues on appeal; the general rule is disregarded when we think it necessary to remedy an obvious injustice." *United States v. Stillwell*, 986 F.3d 196, 200 (2d Cir. 2021). When we exercise our discretion to consider a forfeited argument, however, we typically review such matters only for plain error. *See, e.g.*, *United States v. Edwards*, 342 F.3d 168, 179 (2d Cir. 2003) (reviewing a challenge to the admissibility of a statement under Rule 404(b) for plain error); *see also, e.g.*, *United States v. Stuckey*, 317 F. App'x 48, 50 (2d Cir. 2009) (summary order) (same, for the admission of allegedly *Miranda*-deficient statements).

Then, compounding that omission, Mendonca also failed to object to Judge Bulsara's R&R rejecting his arguments and recommending that the suppression motion be denied. Rule 59(b) of the Federal Rules of Criminal Procedure provides

---

voluntariness and truthfulness of the inculpatory statements." Dkt. No. 56 at 3.

that failure to timely object to a magistrate's recommendation "waives a party's right to review." Fed. R. Crim. P. 59(b)(2). In this case, the R&R provided a 14-day window for Mendonca to object. He never did.

To be sure, there is ample authority from this Court, and others, holding that because a Rule 59 waiver is "non-jurisdictional," it "can be excused in the interests of justice." *United States v. Ballares*, 317 F. App'x 36, 38 (2d Cir. 2008) (summary order); *see United States v. Romano*, No. 15-992-CR, 2022 WL 402394, at *4 (2d Cir. Feb. 10, 2022) (summary order) (same), citing *United States v. Male Juv. (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997) (holding, in a pre-Rule 59[16] case, that "failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object").[17] But Mendonca has not

---

[16] Rule 59 was promulgated in 2005, and amended in 2009 to extend the default objection window from 10 to 14 days. *See* Fed. R. Crim. P. 59 advisory committee's notes to 2005 adoption and 2009 amendment.

[17] *Accord United States v. Broadnax*, 691 F. App'x 604, 605 (11th Cir. 2017) (unpublished opinion); *United States v. Merrett*, 9 F.4th 713, 716 (8th Cir. 2021) (similar, for failure to object under Rule 59(a)), citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985) (holding, in a pre-Rule 59 case, that because the failure to object to a magistrate's report implicates a "nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interests of justice").

alerted us to (nor have we found) any authority for the proposition that "the interests of justice" extend to situations where a defendant not only failed to object to a magistrate's R&R, but where the heart of the defendant's appellate case was never presented to the magistrate to begin with.

There is good reason for that. Timely raising issues and objections below, once again, "gives the district court the opportunity to consider and resolve them." *Puckett*, 556 U.S. at 134 (adding that the district court "is ordinarily in the best position to determine the relevant facts and adjudicate the dispute"). In this case, Mendonca's failure to raise his concerns below has left key evidentiary holes in all the places where, as discussed further below, a properly alerted district court might have been able to develop a record that could have illuminated (or refuted) the police trickery central to Mendonca's coercion claims – in particular, whether the polygraph was just a prop to playact a suspect into confessing, or whether there was indeed fire beneath all the smoke and mirrors.[18]

_____

[18] We do not suggest that polygraph examinations are scientifically valid tools of "lie detection." The issue here is not whether such an exam would be "proof" (let alone admissible evidence at trial) one way or the other as to Mendonca's guilt. In this case, no one sought to introduce evidence of the polygraph exam at trial. The question, rather, is whether the purported results of the examination were presented to Mendonca in good faith, were exaggerated, or were altogether fabricated in an effort to trick Mendonca into confessing.

Instead, we are left to guess. It is difficult to fathom how the "interests of justice" require us to effectively imagine into existence, for a defendant's benefit, a record that does not exist precisely because of that defendant's failure to occasion its creation.

Consequently, absent any other persuasive reason to exercise our discretion to consider arguments not raised below, we are left to review the district court's decision to admit Mendonca's inculpatory statements for plain error. *Cf. Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000) (explaining that our discretion to review an unobjected-to magistrate recommendation "is exercised based on, among other factors, whether the defaulted argument has substantial merit or, put otherwise, whether the magistrate judge committed plain error in ruling against the defaulting party").

### E.     Plain-Error Analysis

In analyzing that question, we are guided by the same plain-error standards that governed our review of Mendonca's public trial right challenge. Of particular import for this issue is the second plain-error requirement: "For an error to be plain it must be 'clear or obvious, rather than subject to reasonable dispute.'" *United States v. Montague*, 67 F.4th 520, 534 (2d Cir. 2023), quoting

*Marcus*, 560 U.S. at 262.

As lofty as that bar is for any issue, it is especially daunting for a voluntariness challenge. Not only is a voluntariness determination intensely "fact-specific," *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998), but "what was adequate in one case to produce an involuntary confession does not establish that the same result has been created in a different, but somewhat similar set of circumstances," *Green*, 850 F.2d at 902. Thus, in a context where "[n]o single criterion controls," where we cannot decide voluntariness until "after careful evaluation of the totality of the surrounding circumstances," *Green*, 850 F.3d at 901, and where we have recognized that similar circumstances can and should yield divergent results, it is all the more difficult for any set of facts to clear the plain-error bar.

Despite the concerns we lay out below, this case is ultimately no exception. The most charitable formulation of Mendonca's challenge is that he was lied to about the nature of the evidence against him, and based in large part on that lie, misleadingly threatened on the one hand with punishment for a more serious crime he was never actually suspected of committing, and misleadingly promised leniency on the other. Even assuming for a moment that this case offers

54

a unique blend of those elements that might, *de novo*, invite the extraordinary remedy of a vacated conviction, on plain-error review, that uniqueness is precisely the problem. We have consistently held that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials," or threatened with harsh legal penalties if he did not. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (internal quotation marks omitted); *see also, e.g.*, *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) ("[V]ague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion."); *Haak*, 884 F.3d at 412 ("[T]here is nothing improper in police truthfully telling a defendant that he will be prosecuted to the full extent of the law if he chooses not to cooperate.").

We are similarly constrained by a substantial volume of authority that police conduct that is "false, misleading, or intended to trick and cajole the defendant into confessing does not necessarily render the confession involuntary." *Haak*, 884 F.3d at 409 (internal quotation marks omitted); *see also, e.g.*, *Mara v. Rilling*, 921 F.3d 48, 80 (2d Cir. 2019) (holding that officers' "misrepresentations about the strength of the evidence against [the suspect]" did

not render subsequent confessions involuntary). Even on *de novo* review, those general principles would pose a formidable obstacle to a finding of involuntariness, and any such finding would have to be rooted in the highly specific facts of this case.

Finally, we are constrained by the record itself. Here, Mendonca's failure to preserve the issue below looms large. A central premise powering his appeal is that the voluntariness of his confessions was undermined by Santilli "falsely informing Mendonca that he had failed the polygraph" not just with respect to child pornography, but also with respect to "'hands on abuse of kids' and 'sexual contact with a minor.'" Appellant's Br. 52, quoting App'x 1143. That premise not only stands as an independent claim of error, but also underlies other key components of this appeal – for example, the oft-repeated interrogation refrain that if Mendonca did not admit to possessing child pornography, Santilli would have no choice but to disclose to prosecutors that Mendonca was also suspected of personally abusing children, and to recommend that he be punished accordingly.

But the record contains no finding that Santilli's claim was false, and no evidence from which a fact-finder could assess its accuracy. Apart from his

representations to Mendonca, which one might reasonably be reticent to trust, there is no evidence in the record of Mendonca's actual polygraph results, or of what Santilli subjectively believed those results meant, or indeed whether the purported polygraph exam was actually a real polygraph exam at all. All of that would bear on any assessment of whether Mendonca was coercively duped into confessing, and we are in the dark as to all of it.

And crucially, we likely would not have been in the dark had Mendonca flagged these issues below, either at the outset or via an objection to the R&R. An argument or objection focused on the post-polygraph interrogation might have occasioned the district or magistrate judge to schedule an evidentiary hearing, to review exhibits and affidavits illuminating the polygraph results, to invite testimony from Santilli and others, and to otherwise develop a record that would have shed light on what exactly happened, thus permitting an evaluation of whether the interrogators' behavior went beyond the kinds of deception, threats, and promises (or combinations thereof) that courts have held to be permissible.

Instead, as a direct result of Mendonca's choices below, we have none of that.

Admittedly, were we reviewing Mendonca's challenge *de novo*, or if the record were further developed, things might well look different. We agree with Mendonca that his case presents a troubling blend of ingredients that, at the very least, imperil voluntariness. The first is Santilli's determined pre-exam attempt to position the polygraph as an unassailable investigative tool that would be key to determining Mendonca's fate. Not only did Santilli imply that the test results, alone, could determine whether the police continued to consider Mendonca a suspect,[19] but he also foreboded that unlike in school, "here you need 100 to pass." *Id.* at 1123. The thrust of those pre-exam tactics was surely to cement in Mendonca the sense that his fortunes were tied to his polygraph performance, and to imply that because only a guilty person would refuse the test, Mendonca's refusal to participate would be taken as incriminating evidence.

Then, as soon as Santilli was in a position to characterize (honestly or not)

---

[19] The focus of Mendonca's initial suppression motion, which he to some extent reprises here, was on these efforts to encourage him to take the polygraph exam: in particular, Santilli's assurance that passing the exam would "eliminate" Mendonca as a suspect, coupled with what Mendonca has characterized as improper (and bad) legal advice that Mendonca should not take the test if guilty, but should absolutely take it if innocent. Like the district court, we disagree that these pre-exam tactics were sufficient on their own to render his subsequent statements involuntary. *See Haak*, 884 F.3d at 409. But that does not disqualify them from factoring into a larger set of circumstances that threaten voluntariness.

58

Mendonca's polygraph performance, he was able to pour on additional threats and promises. The instant Santilli returned from (purportedly) reviewing Mendonca's polygraph results, the detective – at first on his own, and later in tandem with Cousins – began the first of what would become many variations on the theme that Mendonca was suspected not just of a child pornography offense, but also of actually assaulting children himself, and that his candor with respect to the former was directly tied to whether the latter would play any role in his prosecution or punishment.[20] There is little evidence that any of that was true.

---

[20] The government maintains that the interviewers' focus on potential abuse of children was "reasonabl[e] in light of the defendant's job at an elementary school." Appellee's Br. 68. That may be true in the abstract. But it is also clear from the transcript that their end game here was not to uncover abuse committed by Mendonca, but rather to cajole him into admitting to the child pornography offense they actually thought he had committed. There is vanishingly little in the record that even hints at any investigation into whether Mendonca had personally assaulted children – a response one might reasonably expect from investigators who were truly concerned about that risk in its own right and not simply seizing upon an opportunity for leverage. Similarly, there is some tension between Santilli's representation that the polygraph results indicated that Mendonca was lying about whether he had physically abused children and his statement that unless Mendonca admitted to possessing child pornography, Santilli would assume he was also a hands-on abuser. If the polygraph results really did reflect that Mendonca had already physically abused children, why would a confession to possessing child pornography warrant a recommendation that Mendonca be treated as an "early-stage" child pornography offender who could be prevented from spiraling into a hands-on abuser through therapy?

These circumstances resemble those that imperiled the determination of voluntariness in *Green*, perhaps the closest reference point this Circuit has to offer. 850 F.2d at 903. In that case, even though there was nothing in "the characteristics of the accused or the conditions of interrogation" that gave us pause,[21] we nonetheless remarked that the voluntariness of the defendant's confession was "not free from doubt" based on "troubling" police conduct alone.

---

[21] That is generally true here as well. Mendonca is an educated professional who appeared perfectly cogent and responsive throughout his interactions with police. Nor is there indication of physical mistreatment. Santilli and Cousins repeatedly offered Mendonca water, bathroom breaks, and the like. Still, although Mendonca's challenge is primarily reliant upon the third voluntariness factor ("the conduct of law enforcement officials") alone, rather than "(1) the characteristics of the accused" or "(2) the conditions of interrogation," *Haak*, 884 F.3d at 409 (internal quotation marks omitted), it is worth acknowledging – as we have in the past – that his inexperience with the mechanics of the criminal justice system left him more vulnerable to police bluster and deception than other suspects may have been in his place. *Compare Ruggles*, 70 F.3d at 265 (emphasizing the "extensive criminal record" that had made the defendant "familiar with police questioning"), *with United States v. Young*, 964 F.3d 938, 946 (10th Cir. 2020) (explaining that the defendant's past state arrests "do not convince us that [the defendant] could withstand the coercion created by [the FBI agent's] legal misrepresentations and promises of leniency" based on a fabricated link between the agent and the judge presiding over the defendant's federal case). It is also relevant that throughout the entirety of his interrogation, Mendonca was not represented by counsel. *See Orlandez-Gamboa*, 320 F.3d at 333 (acknowledging that the defendant's representation by counsel was relevant to whether statements induced by promises of leniency undermined the voluntariness of those statements).

*Id.* (describing "the issue of voluntariness" as "a close one"). In *Green*, the "chicanery" included (1) "detectives' misrepresentations that they already had enough evidence for [the defendant's] arrest"; (2) "false promises of help which held out the prospect of more lenient treatment"; and (3) a detective's "reference to the electric chair." *Id.* Ultimately, we deemed the confession voluntary, relying heavily on two mitigating circumstances: the fact that one interviewer's improper tactics were later walked back by a second interviewer, and a statement from the suspect himself that the reason he confessed was not to curry leniency, but rather that "he was afraid that what he had done to the victims in a blackout would be something he was going to do to his own family – maybe even his mother." *Id.* at 903-04. This case features no analogous mitigating factors and a number of analogous aggravating factors, including (1) similar (possible) misrepresentations about the evidence against Mendonca, (2) similar threats and promises founded on those (possible) misrepresentations, and (3) a persistent cloud of potential criminal liability for the sexual assault of children – assuredly among the most pernicious accusations that can be dangled in front of a suspect.

The circumstances here – assuming for the sake of argument that the polygraph test results were misrepresented – also resemble those that other

Circuits have determined to be sufficiently coercive to render a confession involuntary. *See, e.g.*, *United States v. Lopez*, 437 F.3d 1059, 1061, 1065 (10th Cir. 2006) (holding that a confession was involuntary based on agents' insinuations that "the gun residue test they had conducted on Lopez earlier in the day had produced positive results, even though the agents had not actually yet received any test results," along with threats to "prove Lopez's mother was a liar if she tried to corroborate Lopez's alibi" and promises of extreme sentencing leniency in exchange for a confession); *Tobias v. Arteaga*, 996 F.3d 571, 582-83 (9th Cir. 2021) ("[A]nyone in Tobias's shoes would have understood that Detective Arteaga considered anything less than a confession to the murder a 'lie,' because all of Tobias's attempts to deny the accusation were met with statements such as 'you're full of shit' . . . [and thus] in the context of this particular interrogation, any threat that Tobias would be treated harshly for 'lying' was no different than a threat that he would be treated harshly for refusing to cooperate by confessing – exactly the type of threat we have previously held to be categorically impermissible."). On *de novo* review, those comparators would raise significant concerns.

But we are not on *de novo* review. And, in spite of our concerns, we cannot conclude that the district court was "clear[ly] or obvious[ly]" wrong to admit Mendonca's inculpatory statements on the record presented. *Montague*, 67 F.4th at 534 (internal quotation marks omitted). To that end, even *Green*, the Second Circuit precedent arguably most helpful to Mendonca's case, morphs from a *de novo* sword into a plain-error shield: the *Green* panel of course ultimately deemed the confession at issue there voluntary, notwithstanding its analogous concerns. *See* 850 F.2d at 904. And though *Green* may reasonably be distinguished by the mitigating factors that resolved that panel's "doubt[s]" in favor of voluntariness, *id.* at 903, a court might also reasonably construe *Green* as evidence that even the many red flags raised here do not necessarily render a statement involuntary.

In other words, even assuming the circumstances here might warrant reversal on *de novo* review, we simply cannot confidently declare that the matter is no longer "subject to reasonable dispute." *Montague*, 67 F.4th at 534 (internal quotation marks omitted). Therefore, the district court did not plainly err in conforming to the general thrust of that authority and admitting Mendonca's inculpatory statements at trial.

63

**CONCLUSION**

We have considered Mendonca's other arguments and conclude that they are without merit. Thus, for the foregoing reasons, we **AFFIRM** the judgment of the district court.

LOHIER, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in the judgment and in Part II of the majority opinion but write separately because I somewhat disagree with the majority's discussion in Part I about the public trial right and structural as opposed to trial error.

Mere trial errors are discrete mistakes that "occur[] during the presentation of the case to the jury" and are subject to harmless error review. *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991). The "defining feature of a structural error," by contrast, "is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (cleaned up). A structural error thus may consist of "a special category of forfeited errors that can be corrected regardless of their effect on the outcome." *United States v. Olano*, 507 U.S. 725, 735 (1993). As several sister Circuits have pointed out, "[t]he third requisite of plain error review" — the error's effect on a defendant's substantial rights — "is necessarily met where the error at issue is structural." *United States v. Becerra*, 939 F.3d 995, 1005 (9th Cir. 2019); *see United States v. Negrón-Sostre*, 790 F.3d 295, 305–06 (1st Cir. 2015); *United States v. Simmons*, 11 F.4th 239, 269 (4th Cir. 2021); *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012); *United States v. Janis*, 898 F.3d

1

847, 851 n.2 (8th Cir. 2018); *United States v. Clark*, 981 F.3d 1154, 1169 & n.4 (10th

Cir. 2020). And in *United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000), our Court

explained that "[e]rrors are properly categorized as structural only if they so

fundamentally undermine the fairness or the validity of the trial that they require

voiding its result regardless of identifiable prejudice," *id.* at 111 (quotation marks

omitted). Structural error "should be presumed prejudicial if the defendant

cannot make a specific showing of prejudice." *Olano*, 507 U.S. at 735. In that

regard, our review of structural errors differs substantially from plain error

review for trial errors, which requires a clear and obvious error that has a

*demonstrated* rather than presumed effect on substantial rights.

In the context of the Sixth Amendment right to a public trial, presuming

prejudice makes sense: "[I]t would be, in most cases, virtually impossible for a

defendant to demonstrate that the absence of family members or friends from his

trial affected its result," and the public trial right "could well become a right in

name only if the defendant were required to show prejudice." *Carson v. Fischer*,

421 F.3d 83, 95 (2d Cir. 2005) (quotation marks omitted).

But should we presume that structural errors also "seriously affect[] the

fairness, integrity, or public reputation of judicial proceedings," *Johnson v. United*

2

*States*, 520 U.S. 461, 467 (1997) (quotation marks omitted) — the fourth and final prong of plain error review?  At least in the context of the public trial right, in my view, the answer is yes.  "[I]f the searchlight of a public trial serves as a restraint against the abuse of judicial power, then extinguishing it through an improper closure surely threatens to erode the integrity and public reputation of the trial."  Daniel Levitas, Comment, *Scaling Waller: How Courts Have Eroded the Sixth Amendment Public Trial Right*, 59 Emory L.J. 493, 528 (2009) (quotation marks omitted).  The Ninth Circuit has followed that reasoning and developed a rule that structural errors invariably "satisfy the third *and* fourth prongs of plain error review."  *United States v. Ramirez-Ramirez*, 45 F.4th 1103, 1109 (9th Cir. 2022) (emphasis added).  I agree with the majority that such a categorical rule goes too far.  *See* Majority Op. [25–26] (citing *Puckett v. United States*, 556 U.S. 129, 142 (2009)).  It is enough to say that structural errors *typically* compel the reversal of a conviction whether or not harm is shown.

But not in every case.  In rare cases, "countervailing factors" may "satisfy [us] that the fairness, integrity, and public reputation of the proceedings will be preserved absent correction."  *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018).  In my view, this appeal involves the *very* rare case where the

presumption that a structural error impugns the judicial process is rebutted. During jury selection, the District Court faced obvious and unprecedented health and safety restrictions arising from the pandemic and grappled with extraordinary logistical challenges in picking a jury. Nothing could have prepared the court for the thorny set of decisions and careful safety measures that the pandemic demanded. Even in hindsight, it's fair to say that any risk of harm to the perception of fairness, integrity, and reputation of our court proceedings caused by limiting public access to jury selection during a deadly pandemic in New York City was not as grave as the real risk of harm the pandemic itself posed to potential jurors and other court personnel. "Sincere efforts to accommodate the extraordinary practical concerns raised by the pandemic — even if later revealed to be legally erroneous — simply do not impair the perceived fairness or 'public reputation' of judicial proceedings in the same way that such measures undoubtedly would if undertaken during ordinary times." *United States v. Mayo*, No. 21-10181, 2023 WL 5198767, at *2 (9th Cir. Aug. 14, 2023) (quoting *Olano*, 507 U.S. at 736).

For this reason I concur.